**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. <u>7:08-CR-54</u> |
| ) | |
| WILLIAM A. WHITE, ) | |
| ) | |
| Defendant ) | |

**MOTION FOR ACQUITTAL ON COUNTS ONE, THREE, FIVE & SIX OF THE INDICTMENT**

Comes now, the Defendant, William A. White and moves this Court for a directed verdict of acquittal on Counts One, Three, Five and Six of the indictment and states as follows:

**BACKGROUND AND PROCEDURE**

From July 2006, through October, 2008, William A. White was the "self-proclaimed Commander" of the American National Socialist Worker's Party, an organization which used email websites, a magazine, leaflets and phone calls to spread a message of 'white supremacy'. In 2005, White had a dispute with a Citigroup Card Services in which Citigroup exercised a cross-default provision in response to another creditor's wrongful report of default which increased White's interest rates from 6.99% to 33%. White sued and a settlement agreement was entered into in November 2006, the terms of which were that White would pay $14,000 and Citigroup would delete the negative credit report by sending the credit bureaus a letter within fifteen (15) days of receipt of payment.

On March 9, 2007, White made the final settlement payment of $11,200, and on

March 21, 2007, called Citigroup, making numerous calls in an effort to determine the direct number of Jennifer Petsche, a Subject Matter Expert whom White believed was handling his case. White had conversations with several Citigroup employees on the same day. On March 22, 2007, White left a message at Petsche's office, at her home, and by email. The voice mails were business like and non-threatening; the government contended the email was threatening, as it threatened to make her "better known to her customers" and contained a link to articles about the murder of a judge's family members.

On or about May 23, 2007, the Department of Housing and Urban Development issued a press release announcing a fair housing complaint "brought by Tiese Mitchell, Tasha Reddick and others, against their landlord, James Henry, complaining that Henry been racially biased in the administration of his Section 8 housing complex.

In response, using information from the press release, White sent a package to the tenants, including a magazine entitled "The Negro Beast" and a letter, reading in pertinent part:

" Re: your complaint against Henry, LLC….

" Know that the white community has noticed you .. and our patience with you and the government that coddles you runs thin.

"Bill White, Commander

"American National Socialist Worker's Party" (Government exhibit ___).

Later, on a radio broadcast, White described the letter and its resulting controversy as "spooking the spooks".

At trial, two recipients described being threatened by the use of swastikas, by the fact the sender was a white supremacist, and by their impression White was leader of a

2

"big group".

In 2009, Dr. Kathleen Kerr administered a University of Delaware diversity training program. Materials used in training students for this program were on the official school website and included controversial definitions about whites.

This program became the subject of protests which drew national media attention and generated a great volume of phone calls to the University of Delaware offices over a three week period.

On October 31, 2009, White posted personal and business information on Kerr and another University of Delaware administrator with a link to a news article urging protests and the words "go to their homes here" and "we shot Marxists 60 years ago, we can shoot them again." The post included the erroneous information that Kenneth Kerr, Kathleen Kerr's father, was her husband.

Someone identifying himself as White called the University of Delaware, spoke to a secretary and stated that people who felt like she (Dr. Kerr) did should be hunted down and shot.

In August, 2006, Richard Warman, a Canadian attorney, attempted to have the Canadian government shut down White's website after White published Warman's address in conjunction with a call for the United States to invade Canada and have Warman executed. From this time through May, 2008, White followed up with numerous similar messages, some labeled "Kill Richard Warman" and all on the same theme. In August, 2006, White also mailed a magazine with articles on this theme to Warman's home.

There was no evidence that any of White's intended readers acted on this information.

3

In May, 2008, an individual using the name of "ANSWP Commander", a screen name registered to White, posted a comment on the Vanguard News Network Forum, "Good, now someone do it to Richard Warman", in response to an article about the firebombing of the home of a member of the Canadian Communist party. This followed the posting of the statement "Kill Richard Warman", Warman's address, and various articles about Warman on a message board hosted by White. An FBI agent testified he could show White was on the message board at that time, but not that White made the post.

## ANALYSIS

The First Amendment provides that "Congress shall make no law … abridging the freedom of speech". This protection extends to speech which upsets the recipients.

"[A] function of free speech under our system of government is to invite dispute … Speech is often provocative and challenging and may … have profound unsettling effects as it presses for acceptance of an idea. Jerminello v. City of Chicago, 337 US 1, at 4-5 (1949).

"Pleasing speech is not the type that needs protection". Sons of Confederate Veterans, Inc. v. Commissioner of Motor Vehicle, 305 F3d 241 (4th Cir. 2002).

Within the First Amendment, the Supreme Court has carved out certain types of speech which are not protected. "True threats" are not protected. "True threats differ from "political hyperbole" and "very rude offensive method(s) of stating political opposition." Watts v. United States, 394 US 705 at 708 (1969).

"True threats" are defined in Virginia v. Black, 538 US 343 at 344 (2003) as:

"Those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of

4

individuals. The speaker need not actually intend to carry out the threat".

## "TRUE THREAT" AS APPLIED TO COUNT ONE

In Count One, White was convicted of stating to Jennifer Petsche, an employee of Citigroup with whom he believed he had argued March 21, 2007, that:

"I …. Can probably make you better known to your customers than the security measures you enact at your company indicate you would like.  Consider this, as I'm sure, being in the collection business and having the attitude about it that you do, that you often make people upset. Lord knows that drawing too much publicity and making people upset is what did in Joan Lefkow"

A web link to a Google search on Judge Lefkow followed, which would have contained references to the murder of the judge's family members by a dissatisfied litigant.

On its face, this is not a statement of intent to commit an act of unlawful violence. It is a statement of intent to place an address on the internet with the warning that having such information publicly available could cause an unknown other to commit an act of harassment or violence. Here, the "threat" of violence is so unlikely and remote from the threatened act that a reasonable recipient could not have perceived that White intended to commit an act of unlawful violence, or was even soliciting violence.

The publication of personal identifying information is protected even when it seems "threatening".  NAACP v. Claiborne Hardware, 458 U.S. 886 (1982)). Speech does not lose its protected character "simply because it may embarrass others or coerce them into action", even when the speech contains threats of violence. NAACP v. Claiborne Hardware, 458 U.S. 886 at 909 – 910 (1982).

In this case, the act White "threatened" – the publication of an address under

5

potentially intimidating circumstances – was a lawful one, and this could not have constituted a true threat.

Further, the government chose not to put on the person with whom White argued, despite evidence White had a seven minute conversation March 21, 2007 with Janean Humphries, another Citibank employee, and additional lengthy conversations with other employees. Without this context, no reasonable jury would have had enough information about White's communication to determine it a "true threat".

### "INTIMIDATION" AS APPLIED TO COUNT THREE

In Count Three, White was convicted of intimidating witnesses Tiese Mitchell, Tasha Reddick and other residents of a Virginia Beach apartment complex who had brought a racial discrimination suit against their landlord.

In response to a press release issued on behalf of the tenants, White wrote a letter to all residents of the complex stating the "white community ['s] patience with you and the government that coddles you runs thin," referencing the complaint and containing a swastika and the use of the term "nigger". He also mailed a copy of the ANSWP magazine entitled "the Negro Beast".

Later, White stated on a radio show that his letter had "spooked the spooks".

Even more clearly than the threatened speech in Count One, White's speech mirrors the situation in *Claiborne Hardware*. In *Claiborne Hardware*, the NAACP launched a boycott of white-owned stores, which it enforced by collecting the names of boycott violators and reading them in public, in order to prevent the boycott violators from exercising their civil right to shop in those stores. The Court found this use of "social coercism" legal, as it did not directly threaten the boycott violators, even when one of the NAACP speakers talked

6

about "breaking the necks" of the boycott violators at a rally.

In his letter, White threatened no violence, only vague social retribution in the form of lost "patience". No reasonable recipient would have interpreted White's letter to mean he was intending to commit an act of unlawful violence.

This is supported by the witness testimony. Both witnesses testified that they read the letter as a threat because of their perceptions about "white supremacy", the swastikas and "Nazis", and that it was from a "big organization". Yet "the expression of racist and anti-Semitic views … are protected activities and may not be circumscribed by the state, except where advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."  National Socialist White People's Party v. Ringers, 473 F2d 1010 at 1015 (4th Cir. 1972),  and cannot alone transform a lawful expression of views into an act of intimidation involving a "true threat".

The Court also needs to balance White's conduct against the actual impact on the case. Here, both Mitchell and Reddick testified they successfully conducted their litigation and received substantial settlements of $27,000 and $22,000, respectively. While they considered dropping their case, they did not do so, and, in fact, brought additional litigation against White. No actual obstruction occurred.

Given the testimony, the content of the letter, and the failure of the letter to impact the underlying litigation, the jury's verdict on Count Three must be overturned.

## "TRUE THREAT" AS APPLIED TO COUNT FIVE

In Count Five, White was convicted of transmitting a "true threat" against Dr. Kathleen Kerr, a University of Delaware administrator, by either internet, telephone or both. It is unclear from the jury's verdict whether they found he made an alleged phone call to

7

Kerr, or whether they found his threat consisted entirely of an internet posting and message on Yahoo Groups.

Defendant contends no reasonable jury would have found he made the threatening phone call from an individual who identified himself as "Commander Bill White of the American White Socialist Party", and that, without that phone call, defendant's conduct constituted free speech.

Carol Bedgar, a secretary at the University of Delaware, testified that, as she received phone calls that morning, she took notes utilizing her caller ID and a clock. At 10:45 a.m., she recorded a call from a blocked number. The caller spoke in a "cold, dead monotone" and stated he was "Commander Bill White of the American White Socialist Party" and those who think like Kathleen Kerr "should be hunted down and shot". The caller may also have indicated that he had talked with "Chris", whom Bedgar knew to be Kerr's husband. Bedgar stated she had never heard and could not positively identify White's voice.

Samples of White's voice submitted to the Court do not support a "cold, dead monotone". Evidence presented on this Count, and two others of which White was acquitted, showed that a third party or parties, sometimes acting anonymously, and acting independently of White, made threats utilizing information from White's website. Further, no other recipient of a phone call from White, including Chris Hussar, who received a call one to two minutes before White's 10:40 a.m. call to the University of Delaware, alleges White blocked his number. Lastly, it makes little sense that White would have blocked his number, and then identify himself verbally. No evidence suggests that White ever attempted to block nay of his numerous calls to other witnesses in this case.

White did not have Chris' name and believed Chris Hussar's name to be Kenneth.

Finally, the government declined to put on either the records of the caller ID made by Bedgar, or James Tweedy, the individual who took the records and transmitted them to the police department.

In short, no reasonable jury would have concluded White made this call, and it appears White was convicted based on the language of his admitted web posts, which were protected speech.

In the relevant postings, White writes the headline "University of Delaware's Marxist Thought Reform" or "Smash the University of Delaware", followed by both business and personal contact information of Kerr and another University of Delaware official. White was not charged with threatening the other official, who did not receive a threatening phone call.

In those postings, the government contests the statements "go to their homes here" and "we shot Marxists sixty years ago, we can shoot them again" constituted a true threat to harm Kathleen Kerr.

In this case, one must examine the context and circumstances of the communication. U.S. v. Darby, 37 F3d 1059 (4th Cir. 1994). First, White and his organization have no alleged history of violence, instead using "emails, websites, a magazine, leaflets and phone calls" to spread their message. Second, like Watts, the communication was not made to Kerr personally, but to a broad audience of website readers and "400 or more" readers of the Yahoo Group, none of whom responded with more than a letter. Third, nothing in the communication indicates White intended to go to the University of Delaware and shoot anyone. Weighing these factors, the Court must conclude White's statement was not a "true" threat.

9

## "TRUE THREAT" AS APPLIED TO COUNT SIX

In Count Six, White was convicted of publishing statements as part of a two year campaign equating Canadian lawyer Richard Warman with Saddam Hussein, Osama Bin Laden, and Nassam Hezbollah, urging the invasion of Canada or the overthrow of the Canadian government, and urging Warman's execution after a trial by a new Canadian government. White also mailed a magazine with similar material to Warman's house.

During cross-examination, Warman identified himself as a person frequently in the media, and as having spoken to anti-racist groups who have sometimes clashed with police and others in street demonstrations. He admitted urging these groups on to "Maximum disruption" and praising their "frontline activism". He further described how his views are shaped by Canadian laws, which provide criminal and civil penalties for "hate speech", including racist jokes and religious condemnations of homosexuality.

During the period 2006 – 2008, while White published his comments, no actual violence befell Warman. A campaign of protest was directed to his landlord in an effort to have his lease revoked and Warman, who had already purchased a home and was planning to move, moved earlier than expected as a result.

As with the Kerr post, there is no indication White ever stated he intended to go to Warman's home and kill him or otherwise cause Warman physical harm. White's audience, like <u>Watts</u>, was broad, and he, his organization and his audience had no history of violence, other than a general suspicion expressed by some witnesses that white supremacists can be "violent". Like <u>Watts</u>, there is no indication anyone reading these internet postings even considered acting on them. By this analysis, White's comments do not meet the criteria for, and did not create, a "true threat".

## CONCLUSION

In all cases, the violence was so remote from the threatened act, and so abstract, White's comments clearly constituted hyperbole and were protected by the First Amendment.

As such, the Court should enter a verdict of acquittal on Counts One, Three, Five and Six.

Respectfully Submitted,
WILLIAM A. WHITE, Defendant
By his Counsel,

David J. Damico, Esquire
s/    *David J. Damico*
Virginia State Bar ID No. 16229
P.O. Box 1578
Roanoke, VA 24007-1578
DJD@damicolawfirm.com
O 540 343 0888
F 540 345 0275

Raphael Ferris, Esquire
s/    *Raphael Ferris*
Virginia State Bar ID No. 21973
P.O. Box 1791
22 Luck Avenue, SW
Roanoke, VA 24008
ray@rvalaw.com
O 540 344 3233
F 540 344 6608

## CERTIFICATE OF SERVICE

I hereby certify on this the 29th day of December, 2009, I electronically filed the foregoing Motion for Acquittal with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:

C. Patrick Hogeboom, Assistant United States Attorney; John Cotton Richmond, Trial Attorney, Department of Justice; Cindy Chung, Trial Attorney, Department of Justice.

> David J. Damico, Esquire
> s/    *David J. Damico*
> Virginia State Bar ID No. 16229
> P.O. Box 1578
> Roanoke, VA 24007-1578
> DJD@damicolawfirm.com
> O 540 343 0888
> F 540 345 0275
>
> Raphael Ferris, Esquire
> s/    *Raphael Ferris*
> Virginia State Bar ID No. 21973
> P.O. Box 1791
> 22 Luck Avenue, SW
> Roanoke, VA 24008
> ray@rvalaw.com
> O 540 344 3233
> F 540 344 6608