CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 0 4 2010

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

UNITED STATES OF AMERICA,　　　　)
　　　　Plaintiff,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)　　Criminal Action No. 7:08-CR-00054
WILLIAM A. WHITE,　　　　　　　　　)
　　　　Defendant.　　　　　　　　　　)

## Memorandum Opinion and Order

This matter is presently before the Court on the Defendant's Motion For Acquittal On Counts One, Three, Five & Six of the indictment. (Dkt. No. 143). Count One of the indictment charges White with making threatening communications to Jennifer Petsche in violation of 18 U.S.C. § 875(c). Count Three of the indictment charges White with intimidating African-American tenants with the intent to influence testimony in an official proceeding in violation of 18 U.S.C. § 1512(b)(1). Count Five of the indictment charges White with making threatening communications to Kathleen Kerr in violation of 18 U.S.C. § 875(c). Count Six of the indictment charges White with making threatening communications to Richard Warman in violation of 18 U.S.C. § 875(c). White was previously acquitted, after a trial by jury, of Counts Two, Four and Seven of the indictment. The Government filed a Response in Opposition to Defendant's Motion for Acquittal seeking to uphold the Jury's finding of guilt as to the remaining four counts. (Dkt. No. 151). This Court heard oral argument on the Motion on January 20, 2010 making the matter ripe for consideration.

For the reasons that follow, the Court finds that the decision of the Jury as to Counts One, Three, and Five should stand. As to Count Six, the Court finds that there is no substantial

1

evidence which would permit any rational trier of fact to find the Defendant guilty. The Defendant's Motion for Acquittal is **DENIED** as to Counts One, Three, and Five, and is **GRANTED** as to Count Six.

## I. Standard of Review

### A. Judgment of Acquittal

A court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. Pro. 29(a). Courts addressing sufficiency-of-the-evidence challenges must view the evidence in the light most favorable to the government. See Glasser v. United States, 315 U.S. 60 (1942). The court does not evaluate the evidence to determine whether "it believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Instead, the court must ask whether "any rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt" when presented with this evidence. Id. In so doing, the court must always remain deferential to the determination of the jury, particularly when multiple, reasonable interpretations of evidence may have been proffered. The court is always "cognizant of the fact that the jury, not the reviewing court, weighs the credibility of the evidence[,] …resolves any conflicts in the evidence presented and…decides which interpretation [of the evidence] to believe." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (citations omitted). Of particular importance in this case is the Supreme Court's admonition that the evidence not be "examine[d]…in a piecemeal fashion, but consider[ed]…in a cumulative context." Id. at 863 (citing Kyles v. Whitley, 514 U.S. 419 (1995)).

## II. Analysis

### A. Violation of 18 U.S.C. § 1512(b)(1)

In Count Three of the indictment White is charged with using "intimidation with the intent to influence, delay and prevent the testimony in an official proceeding of African American Tenants."    In keeping with the majority of the Counts in the indictment, White did not dispute any of the factual underpinnings to this charge, and instead argued that his actions were protected by the First Amendment.   Therefore, it is an uncontested fact that White mailed packets containing both an offensive letter and an American National Socialist Workers Party (hereafter "ANSWP") magazine to tenants of a Virginia Beach housing development, including several addressees who were named plaintiffs in a HUD complaint against their landlord.  What is contested is whether the mailing of the letter and magazine constituted intimidation and whether the government presented evidence sufficient to prove the requisite intent.   The crucial analysis must focus on the meaning of intimidation, a term left undefined by the words of the statute.   The Court believes that the mailing did constitute "intimidation" under 18 U.S.C. § 1512(b)(1), and that the government presented evidence sufficient to demonstrate the intent required by the statute.

Although statutory interpretation is said to "begin, as always, with the text of the statute," the Court will, instead, first explain why it rejects the meaning of intimidation put forth by both the government and the defendant.  Sepulveda v. Allen Family Foods, Inc., No. 08-2256, 2009 WL 5125769, at *4 (4th Cir. 2009).  The government identifies Virginia v. Black, 538 U.S. 343 (2003), as a potential font for the meaning of intimidation.   "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where the speaker directs

a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Virginia v. Black, 538 U.S. 343, 360 (2003). Although Defendant did not argue that the Black definition was applicable in the instant case, his Motion for Acquittal does endorse the concept that constitutionally impermissible intimidation is a "true threat" that involves placing the victim in fear of unlawful violence. The Defendant, therefore, advanced the argument that when intimidation does not rise to the level of a "true threat" it is protected under the First Amendment.[1] Although the Court agrees that not all types of intimidation are "true threats," the Court rejects the Defendant's argument that the First Amendment necessarily protects those types of intimidation.

If this Court were to hold that the Black definition of intimidation was applicable in the context of 18 U.S.C. § 1512(b)(1), the government would have been required to show that White's actions were a "true threat," i.e., they exhibited an "intent of placing the victim in fear of bodily harm or death." Id. But there was no evidence presented at trial that White "intended to place the victim in fear of bodily harm or death." Id. In fact, the government did not endeavour to demonstrate that White possessed or exhibited this intent. Instead, the government repeatedly asserted that the only relevant intent under Count Three was an intent to "influence, delay, or prevent the testimony." 18 U.S.C. § 1512(b)(1). Accordingly, using the Black definition it

---

[1] Defendant suggested that intimidation as described in United States v. Amos, 566 F.2d 899, 901 (4th Cir. 1977) (interpreting § 2113(a) – a bank robbery statute – to prohibit only "conduct reasonably calculated to produce fear"), would be constitutionally permissible because it would not be a "true threat." The current Fourth Circuit standard of interpreting intimidation under § 2113(a) has changed since Amos. See United States v. Ketchum, 550 F.3d 363, 367 (4th Cir. 2008) ("The intimidation element of § 2113(a) is satisfied if an ordinary person in the teller's position reasonably could infer a threat of bodily harm from the defendant's acts, whether or not the defendant actually intended the intimidation.") (citations omitted). This objective language closely mirrors the Fourth Circuit's jurisprudence on true threats, lending some credence to the government's position that all examples of proscribable intimidation are also true threats per Black. Cf. United States v. Darby, 37 F.3d 1059, 1066 (4th Cir. 1994) (A "true threat" is when "a reasonable recipient familiar with the context of the communication[s]" could find it to contain a serious expression of an intent to injure.). Regardless, in the context of § 1512(b)(1), a comparison with bank robbery "intimidation" is of limited usefulness for our purposes for the same reasons that Black's definition of intimidation is inapposite.

would be difficult to find that the government presented sufficient evidence to support the conviction and preserve the Jury's verdict.

This Court does not believe that the definition of intimidation employed in Black is applicable in the context of 18 U.S.C. § 1512(b)(1). In Virginia v. Black, the Supreme Court addressed a Virginia statute which proscribed "with the intent of intimidating any person...the burning of a cross on the property of another, a highway or other public place" and declared that "any such burning of a cross shall be prima facie evidence of an intent to intimidate." Va. Code Ann. § 18.2-423 (1996). The Supreme Court found that "the Virginia statute does not run afoul of the First Amendment insofar as it bans cross burning with the intent to intimidate," but simultaneously concluded that "the prima facie provision strips away the very reason why a State may ban cross burning with the intent to intimidate." Id. at 362, 365. Consequently, the Supreme Court found that the "prima facie evidence provision...is unconstitutional on its face." Id. at 367. In the Supreme Court's analysis, they distinguished between those cross burnings where "the message is a political one" and those cross burnings where "the burning cross...serves as a message of intimidation, designed to inspire in the victim a fear of bodily harm." Thus, they concluded that a cross burning intended as "a statement of ideology, a symbol of group solidarity" and "performed at a rally would almost certainly be protected expression." Id. at 365-66.

The key distinction that the Supreme Court makes is that the Virginia statute's prohibition of cross burning, even though not content neutral, is constitutionally permissible as long as it is seeks to prohibit unconstitutional intimidation. "The act of burning a cross may mean that a person is engaging in constitutionally proscribable intimidation. But that same act may mean only that the person is engaged in core political speech." Id. at 365. Thus, the Court

was clear that preventing unconstitutional intimidation itself must form the permissible basis for the restriction of speech. "When the basis for the content discrimination consists entirely of the reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." Id. at 361-62 (citing to R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992)). Similarly, the First Amendment has never protected speech which is, by its very nature, a crime. See Rice v. Paladin Enterprises, Inc., 128 F.3d 233, 244 (4th Cir. 1997) (noting that the justifications for free speech that apply to speakers do not reach communications which are simply means to get a crime successfully committed); United States v. Variani, 435 F.2d 758, 762 ("Contrary to the apparent logic of the appellant's contention, speech is not protected by the First Amendment when it is the very vehicle of the crime itself.").

In Black, the crime which the statute sought to prevent was intimidation. Thus the Supreme Court necessarily concluded that the intimidation prohibited by Virginia statute was itself proscribable. In keeping with previous constitutional analysis, the Court found that intimidation by its very nature, must be "a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Black, 538 at 360. In contrast, here the "substantive evil which Congress sought to prevent" was the improper influence, delay, or prevention of testimony in an official proceeding. Variani, 435 F.2d at 762. Consequently, a "statute serving this purpose is well within the constitutional powers of congress." Variani, 435 F.2d at 762. Where, as here, the intimidation is the vehicle for the commission of a different crime, the intimidation does not need to rise to the level of a true threat.[2] Accordingly, White's argument that, because there was no evidence that his mailing had the "intent to place the victim in fear of bodily harm or death," his mailing

---

[2] For the exact same reason, this Court hereby rejects the Defendant's arguments that his speech was protected by the First Amendment. See Variani, 435 F.2d 758.

should be considered "core political speech" protected by the First Amendment is unavailing. Black at 360, 365.

The intimidation which is forbidden by 18 U.S.C. § 1512(b)(1) should be given a broader interpretation than that suggested by either party. To do so, the Court must turn to the words of the statute itself. As the Supreme Court has stated, "[it] is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989). Here, the illuminating words of the statute are not found in 18 U.S.C. § 1512(b)(1), but in 18 U.S.C. § 1512(a)(2), which targets, "whoever uses physical force or *the threat of physical force* against any person, or attempts to do so with intent to (A) influence, delay, or prevent the testimony of any person in an official proceeding..." 18 U.S.C. § 1512(a)(2)(A) (emphasis added). If the intimidation forbidden in §1512(b) were a "true threat, where the speaker directs a threat to a person or group of persons *with the intent of placing the victim in fear of bodily harm or death*," Black, 538 U.S. at 360 (emphasis added), it would be almost entirely duplicative of 18 U.S.C. § 1512(a)(2). Indeed, it is difficult to imagine a threat made with the intent to place the victim in fear of bodily harm or death that would not contain a threat of physical force. Courts "should not confine [themselves] to examining a particular statutory provision in isolation... [because] the meaning...of certain words or phrases may only become evident when placed in context." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000). Here, after reading 18 U.S.C. § 1512 in its entirety, it is evident that the intimidation envisioned by § 1512(b) is something less severe than the "threat of physical force" captured by § 1512(a)(2).

The less severe nature of "intimidation" in § 1512(b) is confirmed by comparing intimidation to the other actions forbidden by § 1512(b). It is another "familiar principle of statutory construction that words grouped in a list should be given related meaning." Secs. Indus. Ass'n v. Bd. of Governors, FRS, 468 U.S. 207, 218 (1984). Here, 18 U.S.C. § 1512(b) forbids "intimidation," "threats," "corruptly persuad[ing]," and "engag[ing] in misleading conduct." Corrupt persuasion and misleading conduct are clearly non-violent, as are threats of the non-physical force variety.[3] It follows that intimidation as conceived of by the statute would also involve non-violent activities which would not necessarily place the victim in fear of bodily harm or death; a concept of intimidation much less severe than outlined in Black. In accordance with this interpretation, the potential punishment under § 1512(b) allows for the imposition of fines instead of imprisonment, whereas § 1512(a) does not, thus anticipating the potential for a significantly lighter punishment.

In United States v. Gartman, 53 F.3d 329 (4th Cir. 1995) (table), the Fourth Circuit refused to find plain error in a District Court's definition of intimidation as used in § 1512(b) as "the use of any words or actions that are intended or designed to harass, frighten or threaten a person to do something that person would not otherwise do or not to do something the person would otherwise do." Gartman, 53 F.3d at Sec. V. Specifically, the Fourth Circuit explained that "the inclusion of 'harassment' in the jury instruction on 'intimidation' in the instant case was wholly supported by a commonsense understanding of both words." Id. This Fourth Circuit opinion appears to be the only case laying out a definition of "intimidation" under the statute. Although in Gartman the defendant used physical force against the witness, thus obviating the need for the Fourth Circuit to clearly delineate the scope of actions that would constitute

[3] The Court must assume that the threats prohibited in § 1512(b) are threats of some recourse other than physical force, the prohibition of which is covered by the immediately proceeding § 1512(a)(2).

intimidation, this Court agrees that a commonsense understanding of intimidation would be sufficient to guide the jury and sufficient to uphold this conviction. Indeed, another fundamental canon of statutory construction is that "the words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979).

An ordinary, common meaning of intimidation does not require physical force or the threat of physical force. For example, repeated late night phone calls complete with heavy breathing on the other end of the line would, in a commonsense interpretation, likely be considered intimidation. If these phone calls were made to a potential witness in an official proceeding with the intent to prevent their testimony, the government would undoubtedly consider these calls to violate the statute. There is no danger of this more nebulous definition of intimidation rendering the statute unconstitutionally overbroad because the statute still requires a specific intent to influence, delay, or prevent the testimony of any person in an official proceeding. See United States v. Reeves, 752 F.2d 995 (5th Cir. 1985) (finding statute not to be overbroad where "corruptly endeavor[ing]" required an intent to secure an unlawful advantage or benefit). Moreover, intimidation is likely limited in the § 1512(b) context by a requirement that it be objectively determined: "the subjective courageousness or timidity of the victim is irrelevant; the acts of the defendant must constitute intimidation to an ordinary, reasonable person." United States v. Ketchum, 550 F.3d 363, 367 (4th Cir. 2008) (interpreting § 2113(a)). Thus, this Court holds that intimidation does not require a threat made with the intent to place the victim in fear of physical harm or death. Instead, intimidation under § 1512(b)(1) may be found from what an ordinary, reasonable person considers "harassing" or "frightening" activities, as long as they were done with the intent to influence, delay, or prevent the testimony of any person in an official proceeding.

When this analysis is applied in the instant controversy, it becomes clear that the Jury's decision to convict White for violating § 1512(b) when he mailed an offensive letter and an ANSWP magazine to several African-American tenants must stand. When the evidence is contemplated in its cumulative context, the Court cannot say that "no rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt" when presented with this evidence. Jackson, 443 U.S. at 319. White's letter was blatantly offensive and abusive, filled with racial epithets and violent language. The ANSWP magazine (with a cover story titled "The Negro Beast") was more of the same, coupled with a heavy dose of Neo-Nazi slogans and swastikas. Although this Court would hesitate to say either the letter or the magazine contained a threat of bodily harm or death, it readily acknowledges that this mailing could be considered "harassing" or "frightening." White admitted as much in his radio show discussing the incident, explaining that he modeled his actions on the frightening and harassing activities of the Ku Klux Klan. See Gov't Ex. No. 33 at 5:40 to 6:12. When Defendant White effectively characterizes his actions as intimidating, harassing, and frightening, the Jury is certainly entitled to do the same. See United States v. Major, 297 Fed. Appx. 246 (4th Cir. 2008) (table) (holding that defendant's admission that his potentially ambiguous actions were intimidation was a sufficient factual basis for his guilty plea). Thus, the government only needed to present sufficient evidence of White's intent to "influence, delay, or prevent" to meet its burden.

When weighed by the deferential Rule 29 standard, the evidence the government presented as to intent was overwhelming. White's own words were condemning. He specifically referenced the HUD complaint, both in the subject line and body of his letter. Next, he explained in detail that his actions were modeled on the Ku Klux Klan practice of "spooking

the haints." When the Ku Klux Klan dressed in white sheets, impersonated the ghosts of confederate soldiers, and rode through black communities, White expounded, they were "spooking the haints" and would get "the niggers...so terrified" that they did not vote or "do anything." Gov't Ex. No. 33 at 5:40 to 6:12. White bragged about the similarity of his actions: "That's kind of what we've done here. Given them a little bit of spooking with the haints." Id. Viewing all the evidence in context, a jury might well conclude that White's intent, as expressed by his own words, was to scare the African-American tenants to such an extent that they would not "do anything," including pursue the HUD complaint that White referenced in the letter. This Court cannot reject their reasonable interpretation.


### B. Violations of 18 U.S.C. § 875(c)

The Jury also convicted Defendant White of Counts One, Five, and Six of the indictment, all of which are violations of 18 U.S.C. § 875(c). Each of these counts allege that White "transmit[ted] in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another." In general, at trial White did not contest that he had taken the actions alleged in the indictment.[4] But because 18 U.S.C. § 875(c) criminalizes pure speech, it must be evaluated in accordance with protections of the First Amendment. And White, just as in Count Three, contends that his actions are protected speech under the First Amendment. He insists that his words and actions amount to "political hyperbole" and "very rude, offensive method[s] of stating political opposition," categories of speech that the Supreme Court has previously acknowledged as protected. See Watts v. United States, 394 U.S. 705, 708 (1969). The government asserts that his actions were "true threats" and thus are not protected by the First Amendment.

---

[4] The one exception involves part of the alleged threat made to Kathleen Kerr, and will be discussed *infra*.

This Court recognizes that "the bedrock principle underlying the First Amendment...is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." Texas v. Johnson, 491 U.S. 397, 414 (1989). In keeping with this principle, it is well established that "the expression of racist and anti-semitic views... are protected activities and may not be circumscribed by the state." Nat'l Socialist White People's Party v. Ringers, 473 F.2d 1010, 1015 (4th Cir. 1972). But it is similarly well established that there are several categories of speech which do not enjoy the otherwise broad ranging protection of the First Amendment. See Chaplinsky v. New Hampshire, 315 U.S. 568 (1942). One of these categories is speech which is a "true threat." See Watts v. United States, 394 U.S. 705 (1969). The Supreme Court has defined true threats as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individual." Black, 538 U.S. at 344. True threats, therefore, are not protected speech, regardless of their political nature or political inspiration. See United States v. Lockhart, 382 F.3d 447, 452 (4th Cir. 2004) (holding that letter promising to put a bullet in the head of George W. Bush was a true threat, "[even] though the letter contains political statements").

In the Fourth Circuit, violations of § 875(c) are typically evaluated under the objective standard set forth in United States v. Darby, 37 F.3d 1059 (4th Cir. 1994). "Whether a communication in fact contains a true threat is determined by the interpretation of a reasonable recipient familiar with the context of the communication...[not by whether] the defendant subjectively intended for the recipient to understand the communication as a threat." Darby, 37 F.3d at 1066. Thus the Fourth Circuit, in concurrence with many Circuit Courts of Appeal around the country, has maintained that making a "true threat" is a general intent crime, and the

defendant need not have subjectively intended to threaten the individual. And although some commentators believe this objective standard conflicts with the Supreme Court's characterization of a true threat in Black, 538 U.S. at 344 ("statements where a speaker means to communicate a serious expression of an intent [to harm]"), courts in the Fourth Circuit and around the country have continued to apply the "reasonable recipient" test after Virginia v. Black.[5]  See United States v. Armel, 585 F.3d 182, 185 (4th Cir. 2009) ("Statements constitute a true threat if an ordinary reasonable recipient who is familiar with the context...would interpret [those statements] as a threat of injury.") (citations omitted, brackets in original); United States v. Hankins, 195 Fed. Appx. 295, 301 (6th Cir. 2006) (unpublished decision) ("A true threat is a statement that an objective, rational observer would tend to interpret, in its factual context, as a credible threat."); United States v. Zavrel, 384 F.3d 130 (3d Cir. 2004) (agreeing with use of reasonable recipient test); Porter v. Ascension Parish Sch. Bd., 393 F.3d 608, 616 (5th Cir. 2004) ("Speech is a true threat and therefore unprotected if an objectively reasonable person would interpret the speech as a serious expression of an intent to [cause harm].") (citing to Black, 538 U.S. at 359).

Under these courts' readings of Black, the Supreme Court's definition requires only a specific intent *to communicate* the threat to the recipient, and not a specific intent *to threaten*. See Doe v. Pulaski County Special Sch. Dist., 306 F.3d 616, 624 (8th Cir. 2002) ("However, the speaker must have intentionally or knowingly communicated the statement in question.") (decided prior to Black); United States v. Worrell, 313 F.3d 867, 874 (4th Cir. 2002) ("The only

---

[5] See Frederick Schauer, Intentions, Conventions, and the First Amendment, 55 Sup. Ct. Rev. 197, 217 (2003) ("[I]t is plain that both the Commonwealth of Virginia and the Black majority (and, perhaps, the Black dissenters as well) believed that the First Amendment imposed upon Virginia a requirement that the threatener have specifically intended to intimidate."); Roger C. Hartley, Cross Burning – Hate Speech as Free Speech, 54 Cath. U. L. Rev. 1, 33 (2004) ("Black now confirms that proof of specific intent (aim) must be proved also in threat cases."). For a comprehensive review of the debate, see Paul T. Crane, Note, "True Threats" And The Issue Of Intent, 92 Va. L. Rev. 1225 (Oct. 2006).

proof of specific intent required [concerns making the communication]...the government is required to prove only a general intent to threaten...determined not by the defendant's subjective mindset, but by the objective [reasonable recipient test].") (citations omitted) (decided prior to Black). Importantly for the instant analysis, this reading of Black does not change the law of the Fourth Circuit because Darby had previously made this distinction: "the government must establish that the defendant intended to transmit the interstate communication and that the communication contained a true threat...not...that the defendant subjectively intended...a threat." Darby, 37 F.3d at 1066. In Lockhart, while interpreting a similar statute, the Fourth Circuit followed Darby in finding that the intent required by the statute was satisfied because Lockhart "knew that in due course [the threat] would wind up in the hands of law enforcement, and that they would take it seriously and communicate it on up and down the line." Lockhart, 382 F.3d at 452. Other courts have more expressly presented this distinction after Black as well. See New York ex rel. Spitzer v. Cain, 418 F. Supp. 2d 457, 479 (S.D.N.Y. 2006) ("Defense counsel misreads Black....the relevant intent is the intent to communicate a threat, not as defense counsel maintains, the intent to threaten"). This has been the government's argument from the outset, and, accordingly, they strenuously argued that the Defendant should be excluded from presenting evidence regarding his specific intent to threaten. See United States v. Floyd, 458 F.3d 844 (8th Cir. 2006) (affirming District Court's refusal to allow defendant to present evidence as to his subjective intent and rejecting reading of Black which would required proof of subjective intent to threaten). As the Defendant did not present any defense at all, this Court was never called upon to decide that issue.

This Court recognizes the potential for a conflict between the Supreme Court's definition of a true threat and an objective analysis of a true threat. At least two Circuit Courts of Appeal

have seized upon this potential conflict, and resolved it by concluding that the Supreme Court's definition of a true threat in <u>Black</u> precludes an objective analysis.[6] Other courts have suggested that <u>Black</u> be interpreted to require both an objective and subjective inquiry in the analysis of a true threat. <u>See</u> <u>United States v. Parr</u>, 545 F.3d 491, 497 (7th Cir. 2008) ("It is more likely, however, that an entirely objective definition is no longer tenable."). The Defendant highlighted this circuit split in pre-trial motions and refused to concede that the Fourth Circuit's conclusion is correct. Nevertheless, this Court rejects a reading of <u>Black</u> which would be inconsistent with Fourth Circuit precedent. <u>See, e.g.</u>, <u>Armel</u>, 585 F.3d 182 (4th Cir. 2009); <u>Lockhart</u>, 382 F.3d 447 (4th Cir. 2004); <u>Darby</u>, 37 F.3d 1059 (4th Cir. 1994). A reading of <u>Black</u> that transforms "means to communicate" into "subjectively intended to threaten" would require "communicate" to carry much more weight than can reasonably be accorded to the basic understanding of "communicate."[7] It is a much more reasonable conclusion that "means to communicate" simply reiterates the requirement set forth in <u>Darby</u> that "the defendant intended to transmit the interstate communication." <u>Darby</u>, 37 F.3d at 1066. And, moreover, there is "nothing in the Black opinion to indicate that the Supreme Court intended to overrule a majority of the circuits by adopting a subjective test when dealing with true threats." <u>United States v. D'Amario</u>, 461 F. Supp. 2d 298, 302 (D.N.J. 2006). To the contrary, the public policy rationale for prohibiting true threats that is outlined in <u>Black</u> supports a more objective test. "A prohibition on true threats protects individuals from the fear of violence and the disruption that fear engenders, as well as

---

[6] <u>See</u> <u>United States v. Cassel</u>, 408 F.3d 622, 633 (9th Cir. 2005) ("We are therefore bound to conclude that speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat."); <u>United States v. Magleby</u>, 420 F.3d 1136, 1139 (10th Cir. 2005) ("The threat must be made with the intent of placing the victim in fear of bodily harm or death.") (citing to <u>Black</u>, 538 U.S. at 359).

[7] Black's Law Dictionary defines communicate "To bestow, convey, make known, recount, impart; to give by way of information; to talk over; to transmit information. See also Utter." Black's Law Dictionary 279 (6th Edition 1990).

from the possibility that the threatened violence will occur." Black, 538 U.S. at 344 (citations omitted). If the prohibition on true threats is meant to protect listeners from the "fear of violence" and the corresponding "disruption that fear engenders," then the subjective intent of the speaker can not be of paramount importance. "A standard for threats that focused on the speaker's subjective intent to the exclusion of the effect of the statement on the listener would be dangerously underinclusive with respect to the...rationales for the exemption of threats from protected speech." Cain, 418 F. Supp. 2d at 479. This Court therefore holds that Black did not effect a change in the law with regards to threats under 18 U.S.C. 875(c) and that the reasonable recipient test as set forth in Darby should still apply.

Because the applicable test in the Fourth Circuit for analyzing threats is the reasonable recipient test, courts have routinely held that the determination of whether a charged communication is a true threat is a jury question. See United States v. Roberts, 915 F.2d 889, 891 (4th Cir. 1990) ("Generally, what is or is not a true threat is a jury question."); United States v. Maisonet, 484 F.2d 1356 (4th Cir. 1973) (holding that if there is substantial evidence that a reasonable recipient would determine it to be a threat, issue should go to jury). In addressing Defendant's Motion for Acquittal, therefore, this Court must be particularly circumspect in reviewing the conclusions of the Jury. The determination of whether a communication is a "true threat" falls, by its very nature, into the province of the jury. And as noted *supra*, it is "the jury, not the reviewing court, [who]...decides which interpretation [of the evidence] to believe." Burgos, 94 F.3d at 862 (4th Cir. 1996).

Notwithstanding the Court's deference to the conclusions of the Jury, this Court must recognize that other courts have routinely considered several specific factors in evaluating whether a communication was a true threat, factors which emanated directly from the Supreme

Court's original decision distinguishing "true threats" from protected speech.  See Watts v. United States, 394 U.S. 705 (1969).[8]  The presence or absence of these elements may be useful in analyzing the Jury's conclusions as to the Counts charged here.  Among the factors that the Watts Court used to distinguish "political hyperbole" from a "true threat" were: (1) the audience's reaction, (2) the conditionality of the triggering event, (3) the public nature of the speech, and importantly, (4) the "backdrop of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  Watts, 394 U.S. at 707-08.  Other Fourth Circuit precedent has elaborated on and highlighted some of these factors.  See United States v. Bly, 510 F.3d 453, 459 (4th Cir. 2007) ("Unlike in Watts the letter was not addressed to a public audience…it was delivered privately to specific individuals."); Lockhart, 382 F.3d at 452 ("Nothing in Miss Lockhart's actions suggest she intended to engage in political discourse with the Food Lion management.").

To adequately consider the presence or absence of these factors within the deferential approach appropriate for a Rule 29 motion, the Court must now turn to the individual Counts which charged violations of 18 U.S.C. § 875(c).


### I.  Count One – Threatening Communications Toward Jennifer Petsche

The evidence presented by the government at trial was more than sufficient for a "rational trier of fact [to] have found the essential elements of the crime [charged] beyond a reasonable doubt."  Jackson, 443 U.S. at 319.  The Defendant searched for the work phone number of Ms.

---

[8] In Watts, petitioner was taking part in a public anti-war rally on the grounds of the Washington Monument.  While in a small gathering of other young protesters, petitioner remarked that "They always holler at us to get an education.  And now I have already received my draft classification as 1-A and I have got to report for my physical this Monday coming.  I am not going.  If they ever make me carry a rifle the first man I want to get in my sights in L.B.J."  Watts, 394 U.S. at 706.

Petsche by calling Citibank approximately fifty times within three hours, demonstrating a determined, obsessive approach to navigating the Citibank phone system. He then called Ms. Petsche at her home phone number as well, a highly unusual response to what was essentially a credit reporting dispute. Next, he sent Ms. Petsche an email that referenced her home address, her home phone number, work phone number, Citibank's security policies, and his ability to disseminate this information to disgruntled Citibank customers. Finally, the email referenced, although somewhat cryptically, the murder of the Judge Joan Lefkow's husband and mother by a disgruntled former litigant.[9] Although the Defendant is correct in asserting that the email did not specifically threaten to do more than publicize her personal information, the mere fact that email did not contain an express threat does not preclude the jury determining that "a reasonable recipient" knowing the context of the communication would determine the email to be a "serious expression of an intent to commit an act of unlawful violence to a particular individual." Black, 538 U.S. at 344. A reasonable juror might interpret the entire letter and course of dealing as a veiled threat that a particular disgruntled customer, i.e. Defendant White, would visit Ms. Petsche or her family with physical violence.

Compared to the statements in Watts, it is clear that a juror's conclusion that this was a "true threat" would not be irrational, especially with the evidence considered in the light most favorable to the government. Nothing in the email suggests a joking tone, and it was, in fact, an entirely serious matter for both parties. All the communication was narrowly targeted at a private individual, both at home and work. Although the email was grammatically conditional, it

---

[9] In relevant part, the email read: "PS: I took the liberty of buying the Citicard Credit Services, Inc. corporate phone directory and locating information on your outstanding disputed credit accounrts from an internet dealer today, and can probably make you better known to your customers than the security measures you enact at your company indicate you would like. Consider this, as I'm sure, being in the collections business and having the attitude about it that you do, that you often make people upset. Lord knows that drawing too much publicity and making people upset is what did in Joan Lefkow." This was followed by a link to a compendium of articles describing the murder of Judge Lefkow's husband and mother by a disgruntled litigant.

might easily be interpreted to promise "violent retribution if he did not receive the result he sought," and thus a more terrifying threat then the rhetorically conditional speech in <u>Watts</u>. <u>See</u> <u>Bly</u>, 510 F.3d at 459. Finally, there was no "backdrop of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open," <u>Watts</u>, 394 U.S. at 707-08, or any demonstrable intent "to engage in political discourse." <u>Lockhart</u>, 382 F.3d at 452. There were no public issues at stake, merely a private legal dispute. The Court, therefore, is confident in deciding that there was sufficient evidence for a rational juror to find the Defendant guilty beyond a reasonable doubt on Count One.

## II. Count Five – Threatening Communication Toward Kathleen Kerr

The allegations concerning Defendant White's actions toward Dr. Kathleen Kerr were the only allegations that White disputed as a factual matter. At trial, the government presented evidence that White called Dr. Kerr's home phone number, where he spoke to her husband, and Dr. Kerr's office phone number, where he spoke with her secretary. He included these phone numbers, along with her home address, in an article he posted on his website, Overthrow.com. In this same article he described a diversity program being implemented by the University of Delaware, decried both the University and Dr. Kerr as Marxist, and declared to his readers "We shot Marxists sixty years ago, we can shoot them again." White did not contest this evidence, which was further confirmed by phone records and computer printouts. The only contested issue was what Defendant White said when he called Dr. Kerr's office and spoke to her secretary. The Government presented evidence that Mr. White identified himself as the Commander of the American National Socialist Workers Party and said, though perhaps not *in haec verba*, that (1) he wanted to speak to Kathleen Kerr, (2) people who view race like she does

ought to be shot, and (3) he would hunt her down. Defendant White's contention was that shortly after he called, a different individual called and made these statements. Presumably, the Defense meant to imply that the secretary was confused as to the individual who made these comments, and wrongly attributed them to White.

As to this factual contention, it was clearly within the province of the jury to determine who had made these statements. Although Mr. White presented an alternative interpretation of the evidence, if "the evidence supports different reasonable interpretations, the jury decides which interpretation to believe." Burgos, 94 F.3d at 862. This Court must not "rend the garment of which the evidence is woven lest we analyze each individual fiber in isolation" and the evidence, viewed cumulatively, is certainly sufficient for a rational juror to find that Defendant White made those statements. Id.

As to whether, after determining that Defendant White made these statements, his actions were a "true threat," this Court also must defer to the decision of the Jury. Again, the only question this Court must ask is "after viewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319. The Court believes that a rational juror could.

Although White disseminated his opinion on the University of Delaware's diversity program widely, his calls to Kathleen Kerr were individually targeted, very much unlike the speech at the political protest in Watts. There was no rhetorical conditionality as in Watts. Instead, White's statement that "people who view race like [Dr. Kerr] ought to be shot" was uncompromising and demonstrative. His statement that he would "hunt her down" could be considered illustrative of his determination to, in fact, shoot Dr. Kerr. There was nothing that

suggested his words were in jest, nor was the context of his complaint about the diversity program a light-hearted, humorous context. In fact, the University of Delaware was facing many vehement, angry complaints from a variety of sources concerning their diversity program, and none of the complaints were light-hearted or in jest. Cf. Watts, 394 U.S. at 707 ("…both petitioner and the crowd laughed after the statement was made."). The one similarity that White can demonstrate with Watts is that his complaints about the diversity program and his calls to Dr. Kerr were made within the "backdrop of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." Watts, 394 U.S. at 707. The evidence presented by the government established that the University of Delaware's diversity program was a highly contentious political and social issue that received a significant amount of attention from the news media and the public. Nevertheless, this factor is not controlling. Moreover, a juror could reasonably determine that the Defendant was not expressing the desire to participate in an uninhibited, robust debate on public issues, nor the desire "to engage in political discourse," Lockhart, 382 F.3d at 452, but rather the desire to hunt down Dr. Kerr and shoot her because of her beliefs. The expression of that desire, when communicated to Dr. Kerr, might well be considered by a reasonable recipient to be "a serious expression of an intent to commit an act of unlawful violence to a particular individual." Black, 538 U.S. at 344. This Court can not hold that this conclusion is irrational or completely unsupported by the evidence.


### III.  Count Six – Threatening Communications Toward Richard Warman

The factual allegations made by the government relating to Count Six were entirely uncontested by Defendant White. The evidence presented by the Government showed that White posted articles referencing or relating to Richard Warman on a variety of internet websites. One of these postings, made on the Vanguard News Network forum, featured an article regarding the firebombing of a Canadian Communist party candidate's house and included the comment "Good. Now someone do it to Richard Warman." Gov. Ex. 63. Other postings made on Overthrow.com were titled "Kill RW," called for Warman to be "drug [sic] out into the street and shot, after appropriate trial by a revolutionary tribunal," provided his home address and explained that White posted Warman's address, "particularly because it makes him so mad." Gov. Exs. 64, 66. There was also evidence presented that, in July of 2006, White emailed Mr. R. Richmond of the London Free Press together with Richard Warman, and explained that "the people [of Canada] have a moral obligation to rise up against [Canada's elected officials], overthrow them, and put them to the sword." Gov. Ex. 59A.[10] Finally, the

---

[10] The text of the email is as follows:

Subject: An Uprising Against Canada's Jews Is In Order

Dear Editor:

I read with dismay the recent news that Alex Linder's Vanguard News Network has been shut down by the Canadian Government.

Alex and I have not been friends for three years, but he is correct when he says that the assassination of Canadian Jews and the officials who bow to them would be an act of patriotism.

Canada has become a petty tyranny – the kind of government that no white person should have to live under. And if Canada's elected official's cannot abide by the norms of Western humanity – substituting, instead, the norms of the Zionist occupiers of Palestine – then the people have a moral obligation to rise up against them, overthrow them, and put them to the sword.

If the US government ever went the way of Canada, I would be the first to take up arms against it. It is fortunate that, in this country, despite our faults, we still retain our basic freedoms.

Bill White
American National Socialist Workers' Party

government presented evidence that White mailed a ANSWP magazine to Richard Warman at his home address, the back cover of which contained a picture of Warman, the caption "We Beat This Prick," his home address, and directly below that, an advertisement and solicitation for subscriptions to Defendant White's ANSWP magazine NATIONAL SOCIALIST. Gov. Ex. 60. Inside the magazine were two articles, one describing a recent dispute with Richard Warman, and the other a Canadian "call to arms." Id.[11]

Because there was no dispute as to these factual allegations, the Court must only review the findings of the jury to determine whether a reasonable recipient, familiar with the context of the charged communications, would have considered them to be a serious expression of an intent to commit an act of unlawful violence to a particular individual. Darby, 37 F.3d at 1066; Black, 538 U.S. at 344. Although a court must be deferential to the conclusions of the jury, and view the evidence in the light most favorable to the prosecution, this Court must conclude that no "rational trier of fact could have found the essential elements of the crime [charged] beyond a reasonable doubt" when presented with this evidence. Jackson, 443 U.S. at 319. It is clear, when the evidence is viewed in its cumulative context, that White's actions did not amount to a "true threat" and must, therefore, be deemed protected speech under the First Amendment.

In reaching this determination, the Court notes, first, that much of the evidence and violent language attributed to White was taken from blog postings and articles published on the internet. Contrary to the call made to Kathleen Kerr and the email to Jennifer Petsche, most of the language referring to violence against Richard Warman was not directed or communicated

---

[11] The call to arms, titled "CANADA AWAKE!," contained rhetoric such as "You must take up arms, storm your parliament, and put these corrupt cowards who have taken control in the name of diversity and multiculturalism to the sword. You must seize them, install a new government, and legally execute every single one of them." Later, White writes, "Overthrow your government! Put your Jews to the sword! They have outlawed you talking, they have attacked and imprisoned those who have spoken out, and so the time for speaking is over! The time for action is at hand! ...To war! To glory! To revolution!"

directly to Warman. The Court is concerned by this distinction because <u>Darby</u> makes clear that, "the government must establish that the defendant *intended to transmit the interstate communication* and that the communication contained a true threat." <u>Darby</u>, 37 F.3d at 1066 (emphasis added). Similarly, <u>Black</u> may be read consistently with <u>Darby</u> to require a specific intent to communicate: "the speaker *means to communicate*" the threat. <u>Black</u>, 538 U.S. at 344 (emphasis added). Nevertheless, the Court does not suggest that widely published internet postings can never sufficiently exhibit the intent to communicate as to prove a "true threat." Indeed, though most internet postings are not as specifically directed as phone calls, letters, or emails, the Court can certainly conceive of internet postings that may be widely disseminated, but, nevertheless, targeted at certain individuals. In fact, under the circumstances of this case, there has been the suggestion that White knew that Richard Warman frequented white supremacist websites, and would therefore read and become aware of these postings. In some situations, this sort of dissemination may provide the requisite intent to communicate. <u>See</u> <u>Lockhart</u>, 382 F.3d at 451 (finding intent by deciding that Lockhart "knew that in due course [the threat] would wind up in the hands of law enforcement, and that they would take it seriously and communicate it on up and down the line"); <u>Pulaski County Special Sch. Dist.</u>, 306 F.3d at 624-25 (finding intent to communicate where author of letter permitted a friend of the victim to read the threatening letter and later discussed existence of letter with victim); <u>United States v. Kelner</u>, 534 F.2d 1020, 1023 (2d Cir. 1976) (dismissing the notion that communication to an "indefinite and unknown audience" is not communication under the statute because "any would-be threatener could [then] avoid the statute by seeking the widest possible means of disseminating his threat"). Regardless of this ambiguity, a jury might well find the requisite intent to communicate from these circumstances.

Under <u>Watts</u>, however, the widely disseminated nature of these postings has analytical significance beyond the "intent to communicate" analysis indicated above. Like in <u>Watts</u>, these internet postings were made for and to a group of like-minded individuals, much like the group that petitioner in <u>Watts</u> addressed at the anti-war protest. Accordingly, though no one knows whether the audience laughed as they did in <u>Watts</u>, it is an appropriate assumption that the audience of like-minded individuals would have treated these statements as "a kind of very crude offensive method of stating a political opposition" to Warman. <u>Watts</u>, 394 U.S. at 707. White's postings are certainly much more similar to the speech delivered in <u>Watts</u> than the letters in <u>Lockhart</u> or <u>Bly</u>. Cf. <u>Lockhart</u>, 382 F.3d at 447; <u>Bly</u>, 510 F.3d at 456. Though the tone of White's postings could not be characterized as light-hearted jests, they are easily susceptible to characterization as mean-spirited ridicule and harassment, reminiscent of grade school bullying – particularly White's comment that he disseminates Warman's address "particularly because it makes him so mad."

Additionally, the violent language on the blog postings themselves indicate no express or implied intent to perpetrate violence against Richard Warman, but instead expressly advocate for his assassination and execution. It is a well established principle of First Amendment law that "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." <u>Brandenburg v. Ohio</u>, 395 U.S. 444, 447 (1969). Here, the government contends that they have not charged White with incitement, presumably to avoid needing to show that the advocacy was "likely to incite or produce [imminent lawless action]." <u>Id.</u> But the government should not be permitted to charge an individual with making a threat, and then seek a conviction by presenting

evidence which clearly implicates the contrary and distinct concepts of advocating and inciting violence. Permitting a conviction on such evidence as presented here would eviscerate the protections that the Supreme Court has steadfastly endorsed with respect to the mere advocacy of violence and forever blur, impermissibly, the line between protected and prohibited speech.

There are circumstances where advocacy of violence may be expressed in such a way as to also be a "true threat." See United States v. Kelner, 534 F.2d 1020 (2d Cir. 1976). In Kelner the Second Circuit found that defendant's statements that "we have people who have been trained...and intend to make sure that Arafat and his lieutenants do not leave this country alive...we are planning to assassinate Mr. Arafat" were a true threat. Id. at 1021. This was in spite of Defendant Kelner's argument that his objective was only to advocate violent resistance by the Jewish Defense League, i.e., "to show the PLO that we as jews would defend ourselves and protect ourselves." Id. at 1022. There the court determined his words to be a "threat on [their] face" and yet simultaneously seemed to echo Brandenburg in focusing on the nature of the words: "unequivocal, unconditional, immediate and specific as to convey a gravity of purpose and imminent prospect of execution." Id. at 1027. The same cannot be said about Defendant White's internet postings. Instead, White's advocacy is more similar to the advocacy that abortion opponents have engaged in, advocacy evaluated by the Ninth Circuit in Planned Parenthood of Columbia/Willamette, Inc. v. Am. Coalition, 290 F.3d 1058, 1080 (9th Cir. 2002). In Planned Parenthood the Ninth Circuit concluded that a website comparing abortion providers with Nazis and future trials of abortion providers and government officials with the Nuremberg trials was merely "offensive and disturbing," falling, therefore, into a category of speech protected by the First Amendment.[12] Planned Parenthood, 290 F.3d at 1080. Certainly, calling

---

[12] The Ninth Circuit determined that some of the Nuremberg files went too far because names of abortion providers who had been previously murdered had been struck-through with a black line, while those who had been previously

for Richard Warman to be "dr[agged] out into the street and shot, after appropriate trial by a revolutionary tribunal of Canada's white activists" or expressing the hope that someone firebombs his house is offensive and disturbing, and perhaps frightening to Richard Warman. However, when these words are considered, in the context of widely disseminated, publicly available internet postings, made to an audience of like-minded individuals, and with "a backdrop of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open," Watts, 394 U.S. at 707-08, they cannot be considered a true threat. Instead, these words are merely "vehement, caustic and…unpleasantly sharp attacks on government and public officials." Id. These assorted internet posts, even viewed in the light most favorable to the prosecution, can not be deemed sufficient evidence to prove that White intended to communicate "a serious expression of an intent to commit an act of unlawful violence" toward Richard Warman. Black, 538 U.S. at 344.

The Jury, however, may have convicted White based on the communications that White made directly to Richard Warman, i.e., the email of July 2006 or the NATIONAL SOCIALIST mailer of October 2006. For reasons similar to those outlined above, however, the communications that Defendant White did directly transmit to Richard Warman can also not be considered "true threats." These communications differ from the internet postings because they *are* directly targeted at Richard Warman. Though not a determinative factor, the Fourth Circuit has clearly recognized the importance of public dissemination in a "true threat" analysis. See Bly, 510 F.3d at 459 ("Unlike in Watts the letter was not addressed to a public audience, and as in Lockhart, it was delivered privately to specific individuals."). But White's email was addressed to "Dear

---

wounded were struck-through in grey. Additionally, they were viewing the Nuremberg files in connection with several "WANTED" posters which also highlighted and struck-through the names and faces of those abortion providers who had been murdered by like-minded individuals. See Planned Parenthood, 290 F.3d at 1080-1081. These aggravating factors are entirely absent from the evidence presented by the government in this case.

Editor," responded to a recent news article, and expressed agreement with a point of view discussed in the article. Although perhaps it was not chosen for publication by the London Free Press in the "Letters to the Editor" section, it appears to be written in an entirely appropriate tone for publication, notwithstanding the extremist and anti-semitic viewpoints espoused. Cf. Bly, 510 F.3d at 456 (letters contained practice targets with cover sheets reading "TESTIMONY TO MY ABILITY WITH SMALL-BORE AND HIGH-POWER RIFLES," as well as warnings that "if this remains class warfare, I assure you of tragic consequences"). The magazine, although sent specifically to Richard Warman, contained articles which were assuredly not directed to Richard Warman, but rather to the readers and purchasers of the magazine. Thus, although the "mailing" was not publicly disseminated, the words and contents of the magazine were publicly disseminated. Accordingly, directly beneath the picture of Richard Warman on the back cover of the magazine is an order form soliciting subscribers who are "Tired of the Jews taking away [their] rights[.]" Similarly, one of the articles inside the magazine discussing Richard Warman can only be classified as gloating, in keeping with the caption over Richard Warman's picture, "Yeah, We Beat This Prick."[13] Viewed cumulatively and in context, the entirety of the magazine can only be interpreted as White's attempt to thumb his nose at Warman and ridicule Warman's failed efforts to block a website run by White. Thus, the analytical magnitude of the fact that the email and magazine were directly communicated to Warman is significantly reduced.

Although the email and magazine were sent directly to Warman, in every other respect they are simply not susceptible to characterizations as "serious expressions of an intent to commit an act of unlawful violence." Black, 538 U.S. at 344. They can be characterized only as

---

[13] The text of the article, titled "VICTORY OVER CANADA!," reads in relevant part, "the Canadian Jewish Congress backed [Warman's attempts to ban White's website]...But then they hit a road bump – they lost their case. Two days later the Canadian Radio and Telecommunications Committee denied the request and barred Warman from refiling. It was his first defeat from a white activist."

"political hyperbole" or, at worst, the mere "advocacy of the use of force or of law violation." Watts, 394 U.S. at 708; Brandenburg, 395 U.S. at 447. As such they are protected under the First Amendment. Both the email and the magazine's articles are heavily cloaked in a rhetorical conditionality. Watts, 394 U.S. at 708. The letter states that "if Canada's elected officials cannot abide by the norms of Western humanity – substituting instead the norms of Zionist occupiers of Palestine" they must be overthrown. The magazine warns that war is now inevitable because "Canada is no longer free...its government has turned against its people and begun a systematic oppression that can only end in Bolshevik terror." Both the letter and magazine are clearly made with "a backdrop of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open...[even when] it may include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials." Watts, 394 U.S. at 707-08 (citing NY Times Co. v. Sullivan, 376 U.S. 254, 270 (1964)). In fact, White himself references this principle in his writings, noting in the magazine that "in America we still have basic freedoms that you lack...we can still speak out" and in the email that "it is fortunate that in this country, despite our faults, we still retain our basic freedoms."[14] Public issues certainly include fomenting revolution in neighboring countries, the invasion of foreign nations, the assassination of enemy leaders, and preserving the freedom of speech in this nation with which to continue advocacy for the above. See Charles Krauthammer, *Essay: Should the U.S. Support the Contras?*, TIME, Mar. 2, 1987 ("Guerrilla war is always morally problematic...but is it wrong to support a resistance seeking to overthrow the rule of the

---

[14] In an abundance of caution, the Court notes that it is not holding that White's subjective characterization of his freedom to write these articles in fact guarantees him the freedom to write these articles. The subjective intent of the speaker is irrelevant in a true threat's analysis. Darby, 37 F.3d at 1066; Bly, 510 F.3d at 456 (ignoring Bly's characterization of his threatening letters, "these comments are not to be interpreted as illegal brandishing of a firearm, blackmail or extortion"). Instead, the Court is identifying an important aspect of the context in which these comments must be considered.

*comandantes*? Americans value freedom in their own country. They would not tolerate the political conditions that Nicaraguans must suffer."); Ann Coulter, *This is War*, NATIONAL REVIEW ONLINE, Sept. 13, 2001 ("We should invade their countries, kill their leaders and convert them to Christianity."); Ronald J. Seivert, *War on Terrorism or Global Law Enforcement Operation*, 78 NOTRE DAME L. REV. 307, 313-17 (2003) (discussing academic and political endorsements of the United State's use of assassination).

As discussed *supra*, this Court must again distinguish between "true threats" and "incitement" in pointing out why the email and magazine must not be considered "true threats." Although the government insists that the evidence was presented to prove that White's communications were "true threats," all of the violent language in these communications is expressly and unashamedly the language of advocacy. The magazine exhorts its readers that "the time has come, Canada, to take up arms and cast off your chains. Your government must be overthrown." The email sent to Richard Warman and the London Free Press asserts that "the people have a moral obligation to rise up against [Canada's elected officials], overthrow them, and put them to the sword." Although the government wishes to convict White of making a "true threat," they have presented evidence that he is inciting revolution in Canada. But it is settled law that "the mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action." Brandenburg, 395 U.S. at 448. Certainly dissemination of a magazine and writing a letter to the editor do not approach "preparing a group for violent action and steeling it to such action." Id. Moreover, after comparing White's actions with a similar case where the line between advocacy and threats was blurred, the Court concludes that the government did not present evidence such that "it cannot be said as a matter of law that appellant was stating only

ideas." Kelner, 534 F.2d at 1025.[15]  Unlike in Kelner, the government presented no evidence that these communications were "unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." Kelner, 534 F.2d at 1027-28.  Consequently, the government has established neither that White made a true threat, nor that he unconstitutionally incited violence.  His speech and actions are, therefore, protected under the First Amendment.

This Court, therefore, viewing the conclusions of the Jury under the deferential standard of Rule 29, finds that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" after considering the email or magazine sent to Richard Warman.  Jackson, 443 U.S. at 319.  Whether they were political hyperbole or the mere advocacy of violence is of no import; regardless of their precise characterization, they were not true threats.  Because these communications, even viewed in the light most favorable to the prosecution, were not sufficient evidence to prove that White meant to communicate "a serious expression of an intent to commit an act of unlawful violence" the Court must acquit the Defendant of the charges in Count Six of the indictment.  Black, 538 U.S. at 344.


### III. Conclusion

After reviewing the Jury's verdict under the applicable deferential standard of review, the Court concludes that the Jury's verdict must stand as to Counts One, Three and Five.  As to Count Six, the Court concludes that there was "no substantial evidence that would permit any

---

[15] In Kelner, the defendant convened a news conference on behalf of the Jewish Defense League. He appeared seated, in military fatigues, behind a desk with a .38 caliber "police" special in front of him. He was accompanied by another man, also dressed in military fatigues, standing to his right. After a reporter asked Kelner whether he was talking about an assassination plot, and Kelner answered in the affirmative, a reporter from news station WPIX interviewed Kelner. During the course of the interview Kelner said: (1) "we have people who have been trained and who are out there now and who intend to make sure that Arafat and his lieutenants do not leave this country alive," (2) "we are planning to assassinate Mr. Arafat. Just as if any other mur [sic] just the way any other murderer is treated," (3) "everything is planned in detail...It's going to come off." Kelner, 534 F.2d at 1021.

rational trier of facts to find the defendant guilty," and the Court must enter a directed verdict of acquittal as to Count Six. <u>United States v. Capers</u>, 61 F.3d 1100, 1108 (4th Cir. 1995). Correspondingly, the Defendant's Motion for Acquittal is **DENIED** in part, as to Counts One, Three and Five, and **GRANTED** as to Count Six.

The Clerk of Court is directed to send a copy of this order to counsel of record for the respective parties.

ENTER: This _4th_ day of ~~January,~~ 2010

_Jule._

Senior ~~United~~ States District Judge