IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | Case No. 7:08CR00054 |
| v. | : | |
| | : | |
| WILLIAM A. WHITE | : | |

## UNITED STATES' MOTION TO DISMISS IN RESPONSE TO PETITIONER'S MOTION FOR RELIEF PURSUANT TO TITLE 28, UNITED STATES CODE, SECTION 2255

## INTRODUCTION

The Court of Appeals has granted William White authorization for a second or successive § 2255 petition to determine whether the new rule of constitutional law announced in *Counterman v. Colorado*, 600 U.S. 66 (2023), applies to his case. ECF No. 446. White has procedurally defaulted his claim and cannot overcome the default. Even if he could, he cannot establish he is entitled to relief because any error is harmless. His Petition should be dismissed.

## FACTS AND PROCEDURAL HISTORY

### A. The Jury Trial and Conviction

In 2006, William A. White formed an organization called the American National Socialist Workers' Party and named himself "Commander." *United States v. White*, 670 F.3d 498, 501 (4th Cir. 2012), *holding abrogated by Elonis v. United States*, 575 U.S. 723 (2015), *and United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016). From his home in

Roanoke, Virginia, he "conducted activities . . . promoting his neo-Nazi white supremacist views by publishing a white supremacist monthly magazine; by posting articles and comments on his white supremacist website, "Overthrow.com," as well as on other similar websites . . .; and by conducting a radio talk show." *Id.* Using his self-appointed title of "Commander," he also sent disturbing and threatening communications to people with whom he disagreed. *Id.* at 504-05. The specific substance of his communications are included in factual arguments below in Section II.B., but, in summary and as is relevant here, he was charged with transmitting threatening communications to (1) a Citibank employee he communicated with after Citibank reported his past due payments to credit agencies; (2) African-American tenants of Virginia Beach apartment complex who were pursuing racial housing discrimination claims against their landlord through the U.S. Department of Housing and Urban Development (HUD); and, (3) the University of Delaware Director of Residential Life, who played a role in implementing a diversity training program. *Id.* at 502-04. He also posted on his website the personal identifiers and complete addresses of some of those people and/or their family members. *See, e.g., id.* at 504-05. The victims of White's threats took his threats seriously and made changes to their lives and daily routines. *Id.* at 503-04.

White was charged with seven counts:

- Four counts of transmitting threats to injury or intimidate individuals in interstate commerce, in violation of 18 U.S.C. § 875(c) (Counts 1, 4-7);

- One count of transmitting a threat to injure in interstate commerce with the intent to extort, in violation of 18 U.S.C. § 875(b) (Count 2); and,

- one count of using, and attempting to use, intimidation with the intent to influence, delay, and prevent testimony in an official proceeding, in violation of 18 U.S.C. § 1512(b)(1) (Count 3).

Indictment, at 16-19, ECF No. 11.

At trial, White proposed jury instructions defining the terms "threat" and "true threat," both of which included a requirement that the speaker intended to convey the serious intent to commit harm:

Defendant's Proposed Instruction

*[handwritten: against the person & involve]*

A threat is a statement expressing an intention to ~~inflict bodily~~ harm to someone of such a nature as could reasonably induce fear as distinguished from idle, careless talk, exaggeration or something said in a joking manner. You must determine whether the threat was a true threat when judged in its context. ⌈A true threat is a serious expression of intent to inflict injury and not merely a vehement or emotional expression of political opinion, hyperbole and arguments against government or public officials⌋ Among other things, you should consider whether on their face and in the circumstances in which they were made, defendant's statements were so unequivocal, unconditional and specific as to convey to the recipient a gravity of purpose and apparent prospect of execution.

Defendant's Proposed Instruction

*[handwritten checkmark]*

"True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals.

Def. Proposed Jury Instructions; ECF No. 135, at 2-3.

The district court declined to give White's proposed instructions and instead instructed the jury it must find two elements were proven on the § 875(c) charges: (1)

"that the defendant knowingly sent or transmitted a communication in interstate commerce," and (2) "that the communication contained a true threat to injury the person of another." Tr., Jury Tr., Jury Instructions, Dec. 18, 2009, at 12-13, ECF No. 237. It then instructed the jury should determine whether a communication is a "true threat" by considering "the interpretation of a reasonable recipient familiar with the context of the communication," and they need not find proof "that the defendant subjectively intended for the recipient to understand the communication as a threat":

```
12            For you to find the defendant guilty of each 875(c)
13    count, you must find that the communication at issue in that
14    count constituted a true threat.  The First Amendment does
15    not protect true threats.  Whether a communication in fact
16    contains a true threat is determined in accordance with the
17    interpretation of a reasonable recipient familiar with the
18    context of the communication.
19            The government does not have to prove that the
20    defendant subjectively intended for the recipient to
21    understand the communication as a threat.  The defendant
22    need not have intended to carry out the threat or have had
23    the ability to carry out the threat.
24            The government does not have to prove that the
25    person who received the threat was actually placed in fear
```

```
1   or harm.  On the other hand, a statement does not become a

2   true threat simply because it instills fear in the

3   listener.  You may, however, consider the reaction of any

4   recipient in determining whether a reasonable person would

5   consider the message a true threat.
```

*Id.* at 13-14.

The jury acquitted White on Counts 2, 4, and 7, but convicted him on the remaining four counts:

| Count 1 | Transmitting in interstate commerce a threat by email to injure JP, an employee of Citibank | 18 U.S.C. § 875(c) |
|---------|---------------------------------------------------------------------------------------------|--------------------|
| Count 3 | Using and attempting to use intimidation to influence, delay, and prevent testimony in an official proceeding | 18 U.S.C. § 1512(b)(1) |
| Count 5 | Transmitting in interstate commerce a threat by telephone and Internet to injury KK, a university professor and administrator | 18 U.S.C. § 875(c) |
| Count 6 | Transmitting in interstate commerce a threat by Internet to RW, a Canadian lawyer | 18 U.S.C. § 875(c) |

Jury Verdict, ECF No. 136.

White moved for a judgment of acquittal on each of Counts 1, 3, 5, and 6. ECF No. 143. As to each count, he argued the evidence did not support the jury finding he had made any "statement of intent to commit an act of unlawful violence." *Id.* at 5, 7. He again asserted the definition of "true threat" is:

> Those statements where the speaker means to communicate a serious expression of an intent to commit an act unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat.

5

*Id.* As to Count 5, he also argued the evidence did not support the jury's finding that he was the person who called the University of Delaware. *Id.* at 7. Although he asserted a true threat requires proof the speaker meant to communicate a specific intent to commit harm, he did so only in the context of a defining the term "true threat." His arguments focused on his claim that no reasonable could have believed White actually intended to commit a violent act. *Id.* at 5, 7 ("No reasonable recipient would have interpreted White's letter to mean he was intending to commit an act of unlawful violence."). He did not argue the government was required to—or had failed to—prove he knew or recklessly disregarded the risk that others would perceive his communications as threatening violence. *Id.* at 1-10.

The district court rejected White's arguments as to Counts 1, 3, and 5, but directed a judgment of acquittal on Count 6.[1]

In April 2010, White was sentenced to 30 months imprisonment and 30 months supervised release. ECF No. 190. White appealed, and the United States cross-appealed. While the appeal was pending, White completed his term of imprisonment and was released to supervised release in April 2011.

## B. The First Appeal

On appeal, as is relevant here, White argued the district court erred in denying his motion for a judgment of acquittal on Counts 1, 3, and 5, and the United States argued the court erred in granting a judgment of acquittal on Count 6. *United States v. White*, 670 F.3d 498 (4th Cir. 2012).

---

[1] Count 6 charged White with threatening a Canadian civil rights lawyer. The court concluded "no rational finder of fact could have found that *a reasonable recipient* of the communication charged in Count 6, familiar with its context, would have considered the communication 'to be a serious expression of intent to commit an act of unlawful violence' and therefore a 'true threat,' as required by for a violation of § 875(c)." ECF No. 190 (emphasis in original).

On March 1, 2012, the Court of Appeals rejected both parties' arguments and affirmed. *Id.* at 516. In affirming Counts 1 and 5, the Court rejected White's argument that § 875(c) and the definition of "true threat" required a specific intent to threaten. *Id.* at 508. It affirmed the use of an objective test to determine if a statement constituted a true threat, *i.e.,* "'the interpretation of a reasonable recipient familiar with the context of the communication.'" *Id.* at 508 (quoting *United States v. Darby*, 37 F.3d 1059, 1066 (4th Cir. 1994)). It then affirmed both Counts 1 and 5, finding the evidence amply supported a finding that the statements constituted true threats. *Id.* at 512.

The Court did, however, vacate his sentence and remand for resentencing due of an unrelated Sentencing Guideline error. *Id.* at 516.

### C. Resentencing and Revocation Proceedings

Prior the resolution of his appeal, White fully served his 30-month term of imprisonment and was released from custody. *See United States v. White*, 810 F.3d 212, 216 (4th Cir. 2016) (summarizing factual history leading to second WDVA case brought against White in 2013, No. 7:13CR13). Prior to his resentencing hearing, in early May 2012, White fled the country for Mexico. *See id.*

A revocation warrant was issued in this case, and his supervised release was revoked in October 2012. ECF No. 310. White was sentenced to a revocation term of imprisonment of 10 months on each of the three counts of convictions, to run concurrently to one another, but consecutive to any other state or federal sentence. *Id.*

White was also resentenced in this case to 33 months imprisonment with 3 years supervised release to follow, with credit for time served. *Id.* at ECF No. 316 at 2.

### D. First § 2255 Petition

White filed a Motion under 28 U.S.C. § 2255 on January 9, 2013, raising a claim of ineffective assistance of counsel for failure to timely file a petition for rehearing *en banc* at the Court of Appeals. *Id.* at ECF No. 332; *see* Mem. Op., ECF No. 344 at 1. The United States responded on March 4, 2013. *Id.* at ECF No. 340. The petition was dismissed on April 11, 2013, and a certificate of appealability was denied. *Id.* at ECF Nos. 344, 345.

### E.  Subsequent Post-Conviction Filings

White filed additional post-conviction motions and challenges, including a motion for a successive § 2255 in the Court of Appeals which was denied on January 28, 2016. ECF No. 378.

White filed a third § 2255 petition on July 10, 2018, alleging a *Brady* violation. ECF No. 382. He also filed a Rule 60 motion to reconsider the denial of a previous § 2255 Petition, ECF No. 396. Both were dismissed as unauthorized successive § 2255 petitions on December 10, 2019. *Id.* at ECF Nos. 297, 398. White appealed the dismissal to the Court of Appeals, which affirmed on July 24, 2020. *Id.* at ECF No. 408.

### F.  Additional Convictions and Sentences

In addition to the supervised release sentence imposed by this Court, White is serving a term of imprisonment arising from three other criminal cases. In 2013, he was sentenced in the Northern District of Illinois to 42 months imprisonment for solicitation to commit a crime of violence against a juror. *United States v. William White*, 1:08-cr-00851 (N.D. Ill.). In May 2014, he was sentenced in this Court to 92 months imprisonment for committing extortion and sending threats in interstate commerce. *United States v. William White*, 7:13-cr-00013 (W.D.Va.). And, in November 2014, he was sentenced in the Middle District of Florida to 210 months imprisonment for

8

committing extortion in interstate commerce, to run concurrently to his 2014 WDVA sentence. *United States v. William A. White*, 6:13-cr-00304 (M.D. Fla.). His current projected release date is September 1, 2037. *See* www.bop.gov/inmateloc/, Register No. 13888-084 (last visited May 21, 2025).

### G. *Counterman v. Colorado*, 600 U.S. 66 (2023)

In June 2015, the Supreme Court first clarified the elements required to prove § 875(c) violations. In *Elonis v. United States*, 575 U.S. 723 (2015), it held that § 875(c) requires some proof a culpable mens rea because the First Amendment requires a showing "the defendant be aware of the threatening nature of the communication." It declined, however, to clarify which mens rea was required—purposeful, knowing, or in reckless disregard the statements would be viewed as a threat. 575 U.S. at 740.

In June 2023, the Supreme Court resolved that question. In *Counterman v. United States*, 600 U.S. 66 (2023), the Supreme Court held the First Amendment requires only proof recklessness. The defendant must have been "aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" 600 U.S. at 79. Put another way, he must have "consciously disregarded a substantial risk that his communications would be viewed as threatening." *Id.* at 69.

Importantly, the Supreme Court explicitly rejected the argument that the speaker must have been "aware of, and intend[ed] to convey" a threat. *Id.* at 74. Instead, it reaffirmed its previous holdings that the definition of "true threat" does <u>not</u> depend on what the speaker intends to convey:

> The existence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the other end. [*Elonis v. United States*, 575 U.S. 723, 733 (2015)]. When the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to "fear of

violence" and to the many kinds of "disruption that fear engenders." *Black*, 538 U.S. at 360, 123 S.Ct. 1536 (internal quotation marks omitted).

*Id.*

### F.    The Instant Petition

On January 10, 2024, White filed a timely motion for second or successive § 2255 with the Court of Appeals seeking the instant § 2255, challenging his conviction in light of *Counterman*. Mot. for Authorization, *In re: White,* No. 24-104, ECF No. 2 (4th Cir. Jan. 10, 2024). In February 2025, the Fourth Circuit held *Counterman* authorized successive § 2255 petitions under 28 U.S.C. § 2255(h), as it was a new rule of constitutional law made retroactive to cases on collateral review by the Supreme Court that was previously unavailable to the defendant. *In re Rendelman*, 129 F.4th 248, 243 (4th Cir. 2025). On March 11, 2025, in light of *Rendelman*, the Fourth Circuit found White had "made a prima facie showing that . . . *Counterman* . . . may apply to his case," and granted authorization for the instant § 2255 Petition to address the issue. ECF No. 446.

### STANDARD OF REVIEW

After conviction and exhaustion of appeals, the Court is "entitled to presume that [a defendant] stands fairly and finally convicted." *United States v. Frady*, 456 U.S. 152, 164 (1982). To overcome this presumption and obtain relief on a motion under 28 U.S.C. § 2255, a defendant must establish an error of "constitutional or jurisdictional magnitude" or an error which "could not have been raised on direct appeal, and if condoned, would result in a complete miscarriage of justice." *United States v. Shaid*, 937 F.2d 228, 233 & n.7 (5th Cir. 1991) (citing *Hill v. United States*, 368 U.S. 424, 428 (1962)).

When considering relief under § 2255 after the Supreme Court "narrow[s] the scope of a criminal statute by interpreting its terms," the district court "should consider any issues related to procedural default and prejudice in addition to the merits of [the petitioner's] claim." *United States v. Waters*, 65 F.4th 199, 204 (4th Cir. 2023). If the petitioner procedurally defaulted the claim by failing to raise it at the trial phase and direct appeal, to excuse the default he must establish either cause and actual prejudice or actual innocence. *Id.* at 204. A "petitioner who has procedurally defaulted his claim 'must clear a significantly higher hurdle than would exist on direct appeal.'" *Id.* at 205 (quoting *Frady*, 456 U.S. at 166).

## ANALYSIS

### I.    White has procedurally defaulted his claims and cannot overcome that default.

If a claim was not raised before the conviction was final, the defendant procedurally defaulted the claim. *Bousley v. United States*, 523 U.S. 614, 621-22 (1998); *United States v. Fugit*, 703 F.3d 248, 253–54 (4th Cir. 2012). The default "may be excused in two circumstances: where a person attacking his conviction can establish (1) that he is 'actually innocent' or (2) 'cause' for the default and 'prejudice resulting therefrom." *Fugit*, 703 F.3d at 253 (quoting *Bousley*, 523 U.S. at 621). White has procedurally defaulted his claim and cannot satisfy either standard to overcome the default.

### A.  White has procedurally defaulted the claim.

At first glance, it may appear White preserved a *Counterman* claim. He did argue at trial and on direct appeal the United States was required to prove a subjective mental state. But, the argument he preserved is, in fact, quite different from what was decided in

*Counterman*. White preserved the argument that a statement cannot be a "true threat" unless there is proof the speaker intended to commit a violent act. *See, e.g.* ECF No. 143 at 5 ("the 'threat' of violence is so unlikely and remote from the threatened act that a reasonable recipient count not have perceived that White intended to commit an act of unlawful violence"), 7 ("No reasonable recipient would have interpreted White's letter to mean he was intending to commit an act of unlawful violence.").

In *Counterman*, the Supreme Court specifically rejected *t*his argument and declined to hold the definition of "true threat" depends on the subjective intent of the speaker:

> Whether the speaker is aware, of and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat, as this Court has explained . . . . The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end.

*Counterman*, 600 U.S. at 74. What *Counterman* did announce was a rule that the defendant must have been "aware that others could regard his statements as threatening violence and deliver[ed] them anyway.'" *Id.* at 79 (quoting *Elonis*, 575 U.S. at 746) (internal alterations removed). It deemed this an appropriate means of satisfying the mens rea requirement and ensure innocent conduct wasn't criminalized because they recognized that the justification from criminalizing threatening speech is caused by the threat itself:

> When the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow. True threats subject individuals to "fear of violence" and to the many kinds of "disruption that fear engenders."

*Id.* at 74.

Not only did White did not preserve a *Counterman* argument in the district court or on direct appeal, but his arguments explicitly argued for an entirely different change in the law—one affirmatively rejected by the Supreme Court in *Counterman. See, e.g.,* ECF No. 143 at 10.

Because White did not preserve a *Counterman* claim, it is procedurally defaulted. He must show either cause and prejudice or actual innocence to overcome the default.

### B. White cannot show cause and prejudice to overcome procedural default.

One way of overcoming procedural default is for the petitioner to prove cause for his failure to preserve the claim and resulting prejudice. White can establish neither.

#### 1. White cannot establish cause to excuse his default.

The cause prong "must turn on something external, such as the novelty of the claim or the denial of the effective assistance of counsel." *Frady*, 456 U.S. at 168. The fact that the law has changed does not automatically constitute cause: "A change in the law amounts to sufficient cause for failing to object only if the change is so novel that its legal bases was not reasonably available or foreseeable at the time of trial." *Shaid*, 937 F.2d at 231 n.5 (citing *Reed v. Ross*, 468 U.S. 1, 16 (1984)). The fact that an argument may be futile before a particular court does not constitute cause. *Bousley*, 523 U.S. at 623. Ineffective assistance of counsel can constitute, but only if the *Strickland* test[2] can be passed. If the defendant relies upon ineffective assistance of counsel to establish cause, he is must "show that his attorney's performance fell below an objective standard of

---

[2] To establish constitutionally ineffective assistance, a defendant must satisfy both prongs of a two-prong test as established in *Strickland v. Washington*, 466 U.S. 668 (1984). First, he must show, considering all the circumstances, that counsel's performance fell below an objective standard of reasonableness. 466 U.S. at 687-91. Second, he must affirmatively prove prejudice, in that there is a reasonable probability that the outcome would have been different if not for the deficiency. *Id.* at 694.

reasonableness and that he suffered prejudice as a result." *Mikalajunas*, 186 F.3d at 492. "[A] mere miscalculation of the likelihood of success" is not sufficient to establish ineffective assistance of counsel. *Id.*

If a defendant is unable to show that actual prejudice resulted, the Court is not required to consider whether adequate cause has been shown. *Frady*, 456 U.S. at 168.

White has not even alleged cause for his failure to preserve a *Counterman* claim. Presumably he has not done so because he continues to conflate his intent argument with a *Counterman* issue. *See supra* Section I.A. His failure to address cause for failure is fatal to any attempt to establish cause and prejudice as a basis for overcoming his default of this claim.

2.   White cannot prove prejudice.

Even if White could establish cause, he cannot prove prejudice. Establishing prejudice requires "a fact-intensive inquiry" similar to plain error review—the petitioner must show "a reasonable probability, but for the . . . error, the outcome of the district court proceedings would have been different." *Waters*, 65 F.4th at 204 (quoting *Greer v. United States*, 141 S.Ct. 2090, 2097 (2021)). To prove prejudice resulted, the defendant must show more than "just the 'possibility of prejudice;'" the error must have resulted in an "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."" *Frady*, 456 U.S. at 170. Colorable evidence that a defendant was wrongly convicted of a crime of which he was innocent can impact the analysis of whether actual prejudice resulted. *Id.*

For the reasons discussed at length below in Section II.B., he cannot show prejudice.

### C. White cannot establish a fundamental miscarriage of justice to overcome procedural default.

Even if a defendant cannot show cause for a procedural default, a defendant may still win relief if his case falls "within 'the narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). To establish a "fundamental miscarriage of justice" justifying review of barred claims, a petitioner must establish that "actual innocence," which means "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Bousley*, 523 U.S. at 623 (internal quotation marks omitted); *Schlup*, 513 U.S at 327. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623–24 (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). He must establish actual innocence by clear and convincing evidence. *Mikalajunas*, 186 F.3d at 493.

White cannot make this showing. As is explained below in Section II.B., the evidence in the trial record is more than sufficient for any reasonable jury to conclude he consciously disregarded the risk that others would find his statements threatening, meaning he cannot prevail on a claim of actual innocence.

Because White cannot overcome his procedural default on a *Counterman* error claim, his Petition should be dismissed.

### II. Even considering White's claim on its merits, he cannot prevail because any error resulting from the jury instruction was harmless.

Even if this Court finds White did not procedurally default his claim and considers the merits of his claim, White cannot prevail. To succeed on collateral review, White must establish the error was not harmless under the collateral review standard. He cannot do

so. There was more than ample evidence presented at trial for any reasonable jury to conclude he consciously disregarded the risk that others would find his statements threatening

### A. A "less onerous" harmless error analysis applies when reviewing the impact of an omitted element on collateral review.

Once direct review is completed, "a presumption of finality and legality attaches to the conviction and sentence," and courts are "entitled to presume" that the defendant's conviction and sentence are lawful. *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (citation omitted); *Frady*, 456 U.S. 152 at. That "presumption of regularity . . . makes it appropriate to assign a proof burden to the defendant" on collateral review. *Parke v. Raley*, 506 U.S. 20, 31 (1992); *see Hawk v. Olson*, 326 U.S. 271, 279 (1945) (explaining that a prisoner necessarily "carries the burden in a collateral attack on a judgment"). Accordingly, the Fourth Circuit and other courts have agreed that a defendant carries the burden of showing a constitutional violation. *See, e.g.*, *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010) ("[T]he district court must determine whether the [§ 2255 movant] has met his burden of showing that this sentence is unlawful on one of the specified grounds."); *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958) ("Because the proceeding under 28 U.S.C. § 2255 is a civil collateral attack upon the judgment of conviction, the burden of proof is upon the petitioner to establish [his claim] by a preponderance of evidence . . . ."); *accord United States v. Brown*, 957 F.3d 679, 690 (6th Cir. 2020) ("A petitioner bears the burden of proof in a § 2255 proceeding . . . .").

An error is harmless on collateral review unless it had a "substantial and injurious effect in determining the jury's verdict." *United States v. Smith*, 723 F.3d 510, 517-18 (4th Cir. 2013); *accord Barnes v. Thomas*, 938 F.3d 526, 533 n.3 (4th Cir. 2019)

(explaining in a a state habeas case that the "the substantial and injurious effect standard" is a "'less onerous harmless-error standard' than the requirement on direct appeal that an error be proven 'harmless beyond a reasonable doubt'" (quoting *Brecht*, 507 U.S. at 623)); *cf. Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) ("In a collateral proceeding, the test is different. For reasons of finality, comity, and federalism, habeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.") (quoting *Brecht*, 507 U.S. at 637; *United States v. Lane*, 474 U.S. 438, 449 (1986))). Because the task of the Court is to "determine whether the erroneous instruction had a substantial and injurious effect or influence on the jury's verdict," the court must "consider the effect or influence that the erroneous instruction had in light of the evidence presented."[3] *Smith*, 723 F.3d at 617.

### B. White cannot prevail because the *Counterman* error is harmless as to Counts 1 and 5.

White cannot meet his burden to show a "substantial and injurious effect" on his case because the error here is harmless. The evidence clearly establishes any rational jury would have found White had the requisite mens rea.

Under *Counterman*, the United States must "show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." 600 U.S. at 69. A review of the evidence proven at trial as to Counts 1 and 5, § 875(c) counts clearly establishes that the evidence was overwhelming that White did exactly that.

---

[3] Even on direct appellate review of a conviction, which has a higher standard of review, the failure to give a jury instruction is subject to harmless error review. *United States v. Chaudri*, 134 F.4th 166, 184 (4th Cir. 2025) The conviction is affirmed as harmless if it is 'clear beyond a reasonable doubt that a rational jury would have the defendant guilty absent the error.'" *Id.*

1. **Count 1:**

Count One charged White with transmitting a threat to injure JP, Jennifer Petsche, a Citibank employee, by email on March 22, 2007. ECF No. 11 at 4, 16. The evidence established as follows.

White had been involved in a dispute with Citibank over their reporting of past due payments to credit bureaus. Trial Tr., Day 2, Dec. 10, 2009, at 85; ECF No. 240 (hereinafter "Day 2 Tr., ECF No. 240"). They had reached a settlement agreement in December 2006, in which White had agreed to pay $14,000 and the bank would request the credit reporting agencies delete the information once the amount was fully paid. *Id.* at 86-88, 92. The agreement advised that it may take up to 45 days for the credit bureaus to update his credit report. *Id.* at 93. Citibank received the last check from White on March 8, 2007, and within a just few weeks, when the information had still not been removed by the credit bureaus, White began contacting Citibank directly. *Id.* at 98

Petsche was a litigation management specialist for Citibank who worked on accounts in litigation, but who had not been involved in White's case. Day 2 Tr., ECF No. 240 at 164-65, 179. On March 21, 2007, the day before the charged communication, White called Citibank demanding to speak to her, which was "very odd" because her job does not involving speaking to customers and this was not the type of issue she normally worked on. *Id.* at 166-67. He left a voicemail on Petsche's work telephone, in which identified himself, stated he wanted to talk to her, and said "I now have your name and direct number, and I will not hesitate to call you back," which Petsche found to be concerning. *Id.* at 167, 169-70.

On March 22, 2007, White he called Petsche's home phone, where he left another voicemail stating he wanted to talk to her, advised he had sent an email to her work

address, and told her to "review it, respond to it, and send over the necessary information as quickly as possible." *Id.* at 171 (audio of Govt. Ex. 11 played); *White*, 670 F.3d at 502 (quoting call). The voicemail left Petsche "very upset" and not able to "sleep very well" as it was "very, very alarming to [her] that someone would call" her home. Day 2 Tr., ECF No. 2410 at 174-75.

The email that White transmitted on March 22, 2007, to Petsche was the basis of charged threat. It was unusual for Petsche to receive an email from a customer as it was "not standard procedure" for their work addresses to be shared "especially to a card member." *Id.* at 176. The email included a hyperlink to a website page, which Petsche opened. *Id.* at 182. It contained information about a highly-publicized case in which the husband and mother of a judge were murdered in her home after she had presided over a high-profile case. *Id.* at 183; In addition to the hyperlink, the email contained the full-identifiers of Petsche and her family members--including name, age, address, and telephone numbers, with the word "confirmed beside it, and read:

> I understand you think you're very tough and you think that by dragging this process out you have created me a lot of misery; that is an incorrect assessment, but I must admit I have run out of patience with you and your smug attitude. I hope the fact that I've obviously paid someone to find you conveys the seriousness with which I take your current attitude.
>
> If you resolve this issue quickly and efficiently I can guarantee you will not hear from me again; if you don't, well, you will be well known to the Citibank customers you are currently in litigation with in [a] very short amount of time.
>
> Again, make my life easy, fax over the letter, and you will not be hearing from me again.
>
> PS: I took the liberty of buying the [Citicard] corporate phone directory and locating information on your outstanding disputed credit accounts from an internet dealer today, and can probably make you better known to your customers than the security measures you enact at your company indicate you would like. Consider this, as I'm sure, being in the collections business

> and having the attitude about it that you do, that you often make people
> upset. Lord knows that drawing too much publicity and making people
> upset is what did in Joan Lefkow.

*White*, 670 F.3d at 502; Day 2 Tr., ECF No. 240 at 176-82 (discussing Govt Ex. 14).

Petsche immediately reported the email to her supervisors, who involved

Citibank's security department, and it was referred to the FBI. Day 2 Tr., ECF No. 240 at

184. Her supervisor confirmed "she had tears in her eyes" after receiving the email. *Id.* at

134. Petsche stayed at work that day "because . . . [she] was too afraid to go home." *Id.* at

185. But she also set about learning what she could about White on the internet,

explaining she "wanted to know what type of person we were dealing with and the

situation, if there was anything he had done before." *Id.* In her internet search, she learned

he had a website called Overthrow.com and was the self-appointed "commander" of an

organization. *Id.* at 187-88.

As a result of the events and what she learned, Petsche stopped walking to her car

alone. *Id.* at 188. She began screening all her calls at home, and had her phone number

unlisted. *Id.* at 188-89. At the time of trial, she testified she had "spent the last almost

three years now in fear of repercussions of Mr. White or his followers." *Id.* at 190.

Petsche's supervisor testified that after following the link in the email, she

concluded Petsche's "husband was in danger." *Id.* at 141. She obtained a photo of White

to give to their security guards with the request they "call 9-1-1 if Mr. White appeared on

the premises." *Id.* at 140-41. Citibank's attorney also testified that he believed the email

"contained threats" due to the inclusion of Petsche's personal information, her direct

work email and phone number which were "confidential and proprietary information of

Citibank", and the link referencing the judge. *Id.* at 100-01. And, he advised White's

attorney in writing that White had sent an email that "appears to contain threats." *Id.* at 101-02.

This evidence establishes the *Counterman* error did not have a "substantial and injurious effect" on the jury verdict. Not only did Petsche and others at Citibank clearly view White's email as a threat, but any reasonable person, with knowledge of these facts, would understand this communication to be a threat to commit violence. And, based on the language of the email and the background and context, any reasonable jury would conclude White either intentionally conveyed a threat or, at a minimum, consciously disregarded the risk that his message would be understood to Petsche and others to be a threat.

The text of the email, and the nature of the hyperlink, clearly conveyed a veiled, but serious threat. There is nothing in the tone or the choice of language to suggest White was productively trying to resolve his issues with Citibank, or to suggest he was joking, being ironic, or using hyperbole. His use of phrases such as "I understand you think you're very tough," "I must admit I have run out of patience with you and your smug attitude," and "I hope the fact that I've obviously paid someone to find you conveys the seriousness with which I take your attitude," establish he intended the email to be confrontational and disturbing. His inclusion of the names, ages, addresses, and phone numbers of Petsche and her family can only mean he intended to communicate to her that he could find find her and her loved ones any time day or night. And, finally, his addition of the hyperlink to the story about the murder of the judge's family conclusively establishes both the existence of an actual threat and the requisite mens rea. The hyperlink is nothing less than a thinly-veiled threat to harm Petsche and/or her family. There was no possible reason for White to include it other than to convey to Petsche the potential violent consequences

21

that could result from not giving him what he wanted. The message is crystal clear to anyone reading the email and hearing the testimony of Petsche: this is what could be in store for you too. Any rationale jury would conclude based upon the text of the email itself that White knew consciously disregarded the risk that what he was sending would be understand as a true threat to do violence.

But that is not all the evidence that supports that conclusion. His voicemail message left on her home phone on the same day as the email underscores the seriousness of the email. He made sure that Petsche knew with certainty that he knew how to find her and was willing to use that information. He already had used it.

And, finally, there is the overall context. The situation leading up to the email was not congenial. White was involved in an actual legal dispute with Petsche's employer. He was reaching out to her to try and compel her to act immediately. In doing so, he had obtained her non-public work phone, email address, and her personal contact information.

It defies logic that White did not intend his communication to be a threat and to be understood to be a threat. At the very minimum, the evidence establishes he consciously disregarded the risk it would be understood to be a threat. Any reasonably jury would conclude that the evidence overwhelmingly established White's guilt.

White's arguments to the contrary are unavailing. He asserts he would have testified about his mental state had it been an issue for the jury to consider. ECF No. 447 at 10. He would have testified that Petsche had made a "vicious attack" earlier, and the jury "would have viewed my comments as the continuation of an argument, not as intentional threat to physically harm" her. *Id*. His proffered testimony actually cuts the other way. He would have underscored for the jury that he was in fact engaged in an

argument with Petsche. Whether he personally intended to convey "an intentional threat to physically harm" her is not the question. The question is whether he consciously disregarded the risk that she or others would understand him to be communicating a threat. The fact that he would have testified to *more* evidence about the seriousness of his perceived conflict with Petsche merely would have underscored that he did in fact disregard that risk. At a very minimum he was reckless in sending the communication, and his own evidence would have proven it.

For these reasons, White cannot met his burden to establish that the omission of the mens rea element had a "substantial and injurious effect" on his conviction for Count One.

### 2. **Count 5:**

For similar reasons, White also cannot meet his burden to prevail as to Count Five. Count Five charged White with communicating a threat by telephone and internet postings directed at Dr. KK, Kathleen Kerr, the Director of Residential Life at the University of Delaware on October 31, 2007. ECF No. 11 at 18; *White*, 670 F.3d at 504. The charged stemmed from a call placed by a person identifying himself as "Commander Bill White of the American White Workers' Party"[4] to Kerr's assistant Carol Bedgar. *White*, 670 F.3d at 504; Trial Tr., Day 6, Dec. 16, 2009, at 34; ECF No. 243 (hereinafter "Day 6 Tr., ECF No. 243"). Upon receiving the call, Bedgar advised White that Kerr was unavailable. *Id.* White responded that he knew she was there as he had just spoken to her husband Chris. *Id.* at 34. In fact, Kerr's husband had just received a call from an unknown

---

[4] There evidence established it was White who placed the call. Amongst the evidence to support that finding were "telephone records show[ing] that a telephone call had been placed that day from White's home to Kerr's office." *White*, 670 F.3d at 504; Day 6 Tr., ECF No. 243 at 38-39.

man asking for his wife. *Id.* at 151. The caller then asked that he confirm the address, reciting Kerr's father's address in New Jersey. *Id.* Kerr's husband hung up the phone. *Id.*

After telling Bedgar that he knew Kerr was there, White then recited to Bedgar Kerr's home telephone number, residential address, and the address for her father in New Jersey—which he apparently believed to be her husband's address as Kerr uses her maiden name. *Id.* at 34-35. Bedgar reiterated Kerr was not in and asked if he wanted to leave a message. *Id.* at 35. He stated, "Yes. Just tell that that people that think the way she thinks, we hunt down and shoot." *Id.* at 36. And then he hung up. *Id.* at 37.

Bedgar described White's tone as "cold" and "dead sounding" and said "it did not sound angry, it did not sound excitable." *Id.* at 36; 54. In her current job and in her former job as an airline ticket agent, she frequently dealt with people frustrated and upset. *Id.* at 31. She said White's tone "was unlike anything [she] had ever dealt with before . . . . it was just—it was threatening." *Id.* at 36-37. She said she "felt evil" and "prayed for protection." *Id.* Bedgar spoke with the associate director of Residence Life, and they promptly interrupted Kerr in a meeting to advise her of the call. *Id.* at 39-40. Upon learning of the call, Kerr "was physically and emotionally shaken" and began to cry out of fear for her family. *Id.* at 41, 169; *see also id.* at 64 (further describing Kerr's reaction at learning of the call).

In addition, on the same day, White posted on his website "Overthrow.com" a post "entitled "University of Delaware's Marxist Thought Reform," that listed Kerr's full name, email address, date of birth, home telephone listed as 'confirmed', and father's address in New Jersey mistakenly calling it her husband's address." *White*, 670 F.3d at 504; Day 6 Tr., ECF No. 243 at 171-74. It also named the university president, his email address, date of birth, spouse's name, spouses' date of birth, home address, vacation home, address and

24

telephone numbers. Day 6 Tr., ECF No. 243 at 171-74. The post instructed readers to go to their homes, and concluded: "We shot Marxists sixty years ago, we can shoot them again!" *Id.* at 174-75.

Shortly after being notified of the call, Kerr was forwarded a link to the webpage. *Id.* at 174. Upon seeing the addresses, the instruction to go to their homes, and the suggestion they be shot, Kerr testified she "was upset" and "terrified." *Id.* at 175. She said it "seemed like a call to action," "a very specific threat." *Id.* One of the first things she said to her husband was that he needed to call and have their phone number changed. *Id.*

Later that morning, the university president arranged a meeting with six university officials, including Kerr and the University of Delaware Director of Public Safety, Frank Latley, because "a threat was made to Dr. Kathleen Kerr." Day 6 Tr., ECF No. 243 at 7. Kerr "was a bit emotional, upset, on the verge of crying." *Id.* at 10. Latley testified he was advised of the phone call and shown a copy of the webpage posting listed the home addresses of Kerr, her father, and the president. *Id.* at 8-9. After reviewing the material, he "was very concerned for the[ir] safety." *Id.* at 9. The fact that someone had searched for and located that many personal details, suggested to him that "it seems like someone is putting a plan in motion." *Id.* at 9-10. In response, Flatley contacted the FBI and law enforcement in New Jersey and Delaware, requesting that uniformed patrols check on the homes listed on the website. *Id.* at 11, 14-15. He also directed his officers to watch the Residence Life and administrative offices on campus, which continued for several weeks. *Id.* at 15, 19. Kerr received an escort to and from the office by security for some time afterwards. *Id.* at 42.

As with Count One, the content and context of the call and the website posting, not only prove that White transmitted a true threat, but also that he—at a minimum—

consciously disregarded the risk that his statements would be viewed as a threat. The evidence established his tone of voice and the phone message's delivery was serious. There was nothing joking or teasing about it. There was nothing in his words or their delivery to suggest he was engaged in hyperbole or being ironic or engaging in any other type of speech. There was absolutely nothing about the call to suggest it was anything but a threat. That conclusion is further supported by the context. White cold-called Kerr's office shortly after Kerr played a role in the university's implementation of a diversity training program that attracted the attention of the national media, and his message explicitly referenced "the way she thinks."

Similarly, the content of website post is itself a threat in its own right and one that also underscores the threatening nature of the phone call. White, who used his full name and self-appointed title during the call, surely knew the public posting would promptly come to the attention of University of Delaware officials, including Kerr. That proves he either he knew or consciously disregarded the obvious fact they would view the posting and phone call as a threat by him to harm to them. As with Count 1, it defies logic that White did not intend to threaten Kerr, and there is more than sufficient evidence for a reasonable jury to conclude that, at a minimum, White consciously disregarded the risk the recipient would have viewed his call and web posting as a threat.

White argues, however, that he is entitled to a new trial in part because of evidence not presented. He asserts he wanted to testify "that [he] did not intend to physically threaten Kerr," but his attorneys convinced him not to because "[his] testimony as to mens rea would be irrelevant and likely excluded." ECF No. 447 at 3. He explains:

> I would have testified that my internet post and phone call were solely intended to further the organizing of an aggressive and confrontational protest of Kerr. . . . I did not intend to physically threaten Kerr and to this

26

> day do not believe that she or anyone else involved in this prosecution,
> including the FBI, DOJ, and this Court, really believe that she felt physically
> threatened.

*Id.* at 4. White's proffered evidence is in fact important to the resolution of this motion for two reasons: first, it demonstrates his continued misunderstanding of the holdings of *Elonis* and *Counterman*, helping to establish he did not preserve the *Counterman* issue at trial; and, second, it provides further evidence that any error is harmless. Whether he intended to commit violence or merely stage "an aggressive and confrontational protest" is still not relevant post-*Counterman* to whether the statement is a true threat. What is relevant is whether White, at a minimum, "consciously disregarded the risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69. His evidence that his communications were meant to be "aggressive and confrontational," combined with the content and context of his communications, provides additional evidence that he did, in fact, consciously disregard the risk that his communications would be viewed as a threat, that any reasonable person understanding the context would understand it to be a threat, and that there is no miscarriage of justice in this case.

For these reasons, White has not met his burden to establish that the *Counterman* error had a substantial and injurious effect on the jury verdict. In fact, the evidence as to both Counts 1 and 5 are more than sufficient to establish that any reasonable jury would have found White had the requisite mens rea when he communicated his threats. His claim should be dismissed.

### D. Count Three is unaffected by *Counterman*.

White does not argue that Count Three should be reversed in light of *Counterman*, nor can he successfully raise a challenge to his witness tampering charge. Because § 1512(b)(1) is already a specific-intent crime, *Counterman* does not apply.

27

As discussed above, in *Counterman*, the Supreme Court held that to avoid "chilling" fully protected expression, the First Amendment requires the government prove in a true-threats prosecution that the defendant subjectively understood the threatening nature of his statement. *Id.* at 75-76. The *Counterman* Court noted there are three types of *mens rea*: purposeful, knowing, and in reckless disregard. *Id.* at 78-79. The Court held a mental state of recklessness is sufficient for true threats cases. In other words, the speaker did not have to *know* he was making a threat, it is enough the speaker was aware "that others could regard his statements as" threatening violence and "deliver[ed] them anyway." *Id.* at 79.

Importantly, *Counterman* examined a state statute that did not contain an express, specific intent element. The Court concluded that, constitutionally, liability should be conditioned on a culpable mental state. *Id.* at 75. The *Counterman* Court thus read a *mens rea* element into the statute to avoid "chilling" or "deterring" protected speech.

The *Counterman* Court did *not* alter the definition of a true threat. To the contrary, the *Counterman* Court confirmed that "[t]he existence of a threat depends not on the mental state of the author, but on what the statement conveys to the person on the other end." *Id.* at 74 (citing *Elonis*, 575 U.S. at 733). But the *Counterman* Court did *add* an element to prosecuting the true threat at issue in that case.

In contrast, § 1512(b)(1) has a specific intent requirement: it requires proof of both knowing behavior *and* an intent to influence a proceeding. 18 U.S.C. § 1512(b)(1); *Arthur Anderson LLP v. United States*, 544 U.S. 696, 705-06 (2005) (§ 1512(b) requires proof "persuaders [were] conscious of their wrongdoing"). That intent is more demanding that mere recklessness. The *mens rea* requirement of § 1512(b)(1) thus satisfies the *Counterman* Court's concern of a criminal statute without a specific-intent requirement

impeding or interfering with the First Amendment.

In White's case, the requisite intent was necessarily found by the jury, so even if *Counterman* did apply, its requirements are satisfied. The jury was instructed it must find White knowingly acted with an intent to impact a witness's statement:

```
24        Count Three of the indictment charges the defendant
25  with tampering with a witness or witnesses in an official

1  proceeding.  To find the defendant guilty of this charge,
2  you must find that the government proved two elements beyond
3  a reasonable doubt:  first, that the defendant knowingly
4  used intimidation against witnesses in an official
5  proceeding; and, second, that the defendant did so with
6  intent to influence, delay, or prevent their testimony in a
7  federal official proceeding.
```

ECF No. at 16-17. The jury was further instructed the terms "intimidate" and "act with intent to influence" include a requirement that White's acts were intentional:

```
13        To intimidate someone means intentionally to say or
14  do something that would cause a reasonable person of
15  ordinary sensibility to be fearful of harm to himself or
16  another.  It is not necessary for the government to prove
17  that any witness was actually frightened.
18        To act with intent to influence the testimony of a
19  person means to act for the purpose of getting the person to
20  change or color or shade his or her testimony in some way.
21  It is not necessary for the government to prove that the
22  person's testimony was, in fact, changed in any way.
```

*Id*. at 17.

Because the jury necessarily found that White conduct was intentional, there is no concern innocent conduct was inadvertently criminalized, and *Counterman* has no application to Count Three.

## **CONCLUSION**

For the above reasons, White has not stated a claim upon which relief can be granted. The Petition should be dismissed.

Respectfully submitted,

ZACHARY T. LEE
Acting United States Attorney

s/ *Jennifer R. Bockhorst*

Jennifer R. Bockhorst
Assistant United States Attorney
Tennessee Bar No. 021395
United States Attorney's Office
180 W. Main Street, Suite B19
Abingdon, Virginia 24210
Telephone: 276-628-4161
Fax: 276-628-7399

## <u>CERTIFICATE OF SERVICE</u>

I certify on this date, May 21, 2025, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, and caused a copy to be sent via first class

mail to:

> William A. White
> #13888-084
> FCI-Cumberland
> P.O. Box 1000
> Cumberland, MD 21501

/s/ *Jennifer R. Bockhorst*

31